**LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., Plaintiffs,**

v.

**Pete WILSON, et al., Defendants.**

**CHILDREN WHO WANT AN EDUCATION, et al., Plaintiffs,**

v.

**Pete WILSON, et al., Defendants.**

**Barbara AYALA, et al., Plaintiffs,**

v.

**Pete B. WILSON, et al., Defendants.**

**GREGORIO T., By and Through his guardian ad litem, JOSE T.; et al., Plaintiffs,**

v.

**Pete WILSON, in his capacity as Governor of the State of California; et al., Defendants.**

**CARLOS P., et al., Plaintiffs,**

v.

**Pete B. WILSON, et al., Defendants.**

**Nos. CV 94–7569 MRP to CV 94–7571 MRP, CV 94–7652 MRP and CV 94–0187 MRP.**

United States District Court, C.D. California.

Nov. 20, 1995.

756

Peter A. Schey, Los Angeles, CA, Carlos Holguin, National Center for Immigrants Rights Inc., Los Angeles, CA, Ann Kanter, Roxana Bacon, American Immigration Lawyers Association, Sacramento, CA, Lee A. O'Connor, Jonathon P. Foerstel, Legal Aid Society of San Diego, Inc., San Diego, CA, Morgan Rose, Legal Services Program, Eastern Valley Branch, Pomona, CA, Miguel G. Caballero, Union Privilege AFL–CIO, Los Angeles, CA, for plaintiffs in No. CV 94–7569 MRP.

Charlton G. Holland, III, California Asst. Atty. Gen., San Francisco, CA, for California State Board of Education.

Stephen Yagman, Marion Yagman, Yagman & Yagman, Venice, CA, for plaintiffs in No. CV 94–7570 MRP.

Bradley Stuart Phillips, Vilma S. Martinez, Eva Orlebeke Caldera, Munger Tolles & Olson, Los Angeles, CA, Howard Friedman, Los Angeles Unified School District, Office of the Legal Adviser, Los Angeles, CA, for Los Angeles United School Dist. in No. CV 94–7570 MRP.

Fred J. Kumetz, Kumetz & Glick, Los Angeles, CA, for Andrea Ayala in No. CV 94–7571 MRP.

Jon M. Ichinaga, California Asst. Atty. Gen., Los Angeles, CA, for Pete Wilson in No. CV 94–7571 MRP.

Cyrus J. Rickards, California Asst. Atty. Gen., Sacramento, CA, for Daniel E. Lundgren in No. CV 94–7571 MRP.

Bruce G. Iwasaki, Alan Rader, Nancy E. Sussman, O'Melveny & Myers, Los Angeles, CA, Vibiana Andrade, Thomas A. Saenz, Antonia Hernandez, Mexican American Legal Defense & Education Fund, Los Angeles, CA, Mark D. Rosenbaum, Silvia Argueta, Mei Lin Kwan–Gett, ACLU Foundation of So. Calif., Los Angeles, CA, for Jose T. Gregorio T., Maria R., Virginia M., Gloria P., Maria G., R.G., Karina G., Angelica G., Cal. League of United Latin American Citizens in No. CV 94–7652 MRP.

Bruce G. Iwasaki, Alan Rader, Nancy E. Sussman, Vibiana Andrade, Thomas A. Saenz, Antonia Hernandez, Stewart Kwoh, Carolyn La, Asian Pacific American Legal Center of Southern California, Los Angeles, CA, Judy London, Central American Refu-

gee Center, Los Angeles, CA, Mark D. Rosenbaum, Laura C. Fry, Silvia Argueta, Mei Lin Kwan–Gett, ACLU Foundation of So. Calif., William R. Tamayo, Asian Law Caucus Inc., San Francisco, CA, Karl Manheim, Loyola Law School, Los Angeles, CA, Lucas Guttentag, ACLU Immigrants' Rights Project, New York City, Susan Lydon, Mark Silverman, Immigrant Legal Resource Center, San Francisco, CA, Sarah Jane Somers, San Francisco, CA, for Xiomara T. in No. CV 94–7652 MRP.

David Jonathan Becker, Loeb & Loeb, Los Angeles, CA, Vibiana Andrade, Thomas A. Saenz, Antonia Hernandez, Elisa Fernandez Cabello, Mexican American Legal Defense & Education Fund, Los Angeles, CA, Stewart Kwoh, Carolyn La, Asian Pacific American Legal Center of Southern California, Los Angeles, CA, Mark D. Rosenbaum, Laura C. Fry, Silvia Argueta, Mei Lin Kwan–Gett, ACLU Foundation of So. Cal., Los Angeles, CA, Judy London, Michele A. Milner, Central American Resource Ctr. Legal Office, Los Angeles, CA, William R. Tamayo, Asian Law Caucus Inc., San Francisco, CA, Karl Manheim, Loyola Law School, Los Angeles, CA, Lucas Guttentag, ACLU Immigrants' Rights Project, New York City, Susan Lydon, Mark Silverman, Immigrant Legal Resource Center, San Francisco, CA, Sarah Jane Somers, San Francisco, CA, Kurtiss Lee Grossman, Kurtiss L. Grossman Law Offices, Los Angeles, CA, Carmela Castellano, Stefan Rosenzweig, Public Advocates, San Francisco, CA, for Guardian Ad Litem Jesus C. in No. CV 94–7652 MRP.

Douglas E. Mirell, David Jonathan Becker, Loeb & Loeb, Los Angeles, CA, Vibiana Andrade, Thomas A. Saenz, Antonia Hernandez, Elisa Fernandez Cabello, Mexican American Legal Defense & Education Fund, Los Angeles, CA, Mark D. Rosenbaum, Silvia Argueta, Mei Lin Kwan–Gett, ACLU Foundation of So. Cal., Los Angeles, CA, Kurtiss Lee Grossman, Kurtiss L. Grossman Law Offices, Los Angeles, CA, for Guardians Ad Litem Blanca D., and Estela A., Luz D., Leonardo D., Araceli O., Maximiliano B., and David S. in No. CV 94–7652 MRP.

Charlton G. Holland, III, Jon M. Ichinaga, Donald P. Cole, California Asst. Attys. Gen.,

Los Angeles, CA, for Pete Wilson, Eloise Anderson in No. CV 94–7652 MRP.

Linda A. Cabatic, Cyrus J. Rickards, California Asst. Atty. Gen., Sacramento, CA, for Dan Lungren in No. CV 94–7652 MRP.

Janet G. McCormick, California Department of Education, Sacramento, CA, Joyce O. Eckrem, California State Department of Education, Sacramento, CA, for Delaine Eastin in No. CV 94–7652 MRP.

James E. Holst, John F. Lundberg, David M. Birnbaum, Gary Morrison, University of California, General Counsel, Oakland, CA, for William T. Bagley, Roy T. Brophy, Clair W. Burgener, Glenn Campbell, Frank W. Clark, Jr., Ward Connerly, John Nmi Davies, Tirso Del Junco, Alice J. Gonzales, S. Sue Johnson, Meredith J. Khachigian, Leo S. Kolligian, Howard H. Leach, David S. Lee, Velma Montoya, S. Stephan Nakashima, Tom Sayles, Dean A. Watkins, Terrence Wooten, Judith Willick Levin, Ralph C. Carmona, Pete Wilson, Gray Davis, Speaker of the California Assembly, Delaine Eastin, David Flinn, Peter Preuss, Jack W. Peltason, and Jack Nmi Peltason in No. CV 94–7652 MRP.

Christine Helwick, Lee R. Rydalch, Jessica K. Frazier, California State University, Long Beach, CA, for Roland E. Arnall, Marian Bagdasarian, William D. Campbell, Ronald L. Cedillos, Jim Considine, Jr., Martha C. Fallgatter, Bernard Goldstein, James H. Gray, William Hauck, Christopher A. Lowe, Joan Otomo–Corgel, Ralph R. Pesqueira, Ted J. Saenger, J. Gary Shansby, Michael D. Stennis, Anthony M. Vitti, Stanley T. Wang, Pete Wilson, Speaker of the California Assembly, Gray Davis, Delaine Eastin, Barry Munitz in No. CV 94–7652 MRP.

Jon M. Ichinaga, California Asst. Atty. Gen., Los Angeles, CA, John Hideki Sugiyama, California Asst. Atty. Gen., San Francisco, CA, for Larry Toy, Joe Dolphin, Alice S. Petrossian, John W. Rice, Jr., Robert A. Alleborn, Philip E. Del Campo, Yvonne Gallegos Bodle, Timothy Haidinger, Paul M. Kim, Vishwas D. More, Paul Priolo, Shirley Ralston, Wilbert L. Smith, Julia Li Wu, David Nmi Mertes in No. CV 94–7652 MRP.

## OPINION

PFAELZER, District Judge.

Proposition 187 is an initiative measure which was submitted to the voters of the State of California in the November 8, 1994 general election. It was passed by a vote of 59% to 41% and became effective the following day. The stated purpose of Proposition 187 is to "provide for cooperation between [the] agencies of state and local government with the federal government, and to establish a system of required notification by and between such agencies to prevent illegal aliens in the United States from receiving benefits or public services in the State of California." Prop. 187, § 1. The initiative's provisions require law enforcement, social services, health care and public education personnel to (i) verify the immigration status of persons with whom they come in contact; (ii) notify certain defined persons of their immigration status; (iii) report those persons to state and federal officials; and (iv) deny those persons social services, health care, and education.

After the initiative was passed, several actions challenging the constitutionality of Proposition 187 were commenced in state and federal courts in California. Ultimately, five actions filed in the United States District Court were consolidated in this Court for purposes of motions, hearings, petitions and trial (collectively, the "consolidated actions").[1,2]

The plaintiffs in the consolidated actions have brought suit for declaratory and injunctive relief seeking to bar California Governor Pete Wilson ("Wilson"), Attorney General Dan Lungren ("Lungren"), and other state actors[3] (collectively, defendants) from en-

---

1. Those cases are as follows:

 (1) *League of United Latin American Citizens v. Wilson*, Case No. CV 94–7569 MRP (the "LULAC Action"). The LULAC Action is a class action on behalf of all persons who: (a) are required to be questioned regarding their citizenship or federal immigration status, or required to produce documentation of their citizenship or federal immigration status, pursuant to §§ 4, 5, 6, 7 and 9 of Proposition 187; (b) are rendered ineligible for public social services, health care, or education pursuant to §§ 5, 6 and 7 of Proposition 187; or are required to be reported as not having legal status or notified either to obtain legal status or leave the United States pursuant to §§ 4, 5, 6, 7, or 9 of Proposition 187.

 (2) *Children Who Want an Education v. Wilson*, Case No. CV 94–7570 MRP.

 (3) *Ayala v. Pete B. Wilson*, Case No. CV 94–7571 MRP.

 (4) *Gregorio T. v. Wilson*, Case No. CV 94–7652 MRP.

 (5) *Carlos P. v. Wilson*, Case No. CV 95–0187 MRP.

2. The Court has permitted the following parties to intervene as plaintiffs: (1) the City of Los Angeles; (2) the California Association of Catholic Hospitals and the Catholic Health Association of the United States (collectively "Catholic Hospitals"); (3) California Teachers Association, California Faculty Association, American Federation of State, County and Municipal Employees AFL–CIO, and Service Employees International Union AFL–CIO (collectively "CTA"); and (4) Islamic Center of Southern California, Muslim Public Affairs Council and California Council of Churches (collectively "Islamic Center").

3. All plaintiffs have sued Governor Pete Wilson and Attorney General Dan Lungren.

 In addition, LULAC plaintiffs named Acting State Superintendent of Public Instruction William Dawson ("Dawson") (Dawson has been replaced by the current Superintendent Delaine Eastin ("Eastin")); director of Department of Social Services Eloise Anderson ("Anderson"); Director of Department of Health Kimberly Belshe ("Belshe"); California State Board of Education; Department of Education; Orange Unified School District; Tustin Unified School District; and San Diego Unified School District.

 Children plaintiffs also named Los Angeles Unified School District and the State of California.

 Ayala plaintiffs also named Dawson; Alhambra Unified School District; and Superintendent of the Alhambra Unified School District Heber Meeks.

 Gregorio T. plaintiffs also named Dawson (who was replaced by Eastin); Anderson; Belshe; individuals who are the members of the California State Board of Education, in their official capacities; individuals who are the Regents of the University of California, in their official capacities; Jack Peltason, president of the University of California; individuals who are the Trustees of the California State University, in their official capacities; Barry Munitz, the Chancellor of the California State University, individuals who are the members of the Board of Governors of the California Community Colleges, and David Mertes, Chancellor of the California Community Colleges.

 Catholic Hospitals, Islamic Center, and CTA, plaintiffs-in-intervention, each filed a complaint against the same persons who were named as defendants by the Gregorio T. plaintiffs.

forcing the provisions of Proposition 187.[4]

On November 16, 1994, the Court entered a temporary restraining order enjoining the implementation of sections 4, 5, 6, 7 and 9 of the initiative. On December 14, 1995, the Court granted plaintiffs' motions for preliminary injunction, enjoining the implementation and enforcement of those sections.

On May 1, 1995, the League of United Latin American Citizens ("LULAC") and Gregorio T. plaintiffs brought motions for summary judgment in which they contend that Proposition 187 is unconstitutional on the sole ground that the initiative is preempted by the federal government's exclusive constitutional authority over the regulation of immigration, Congress' exercise of that power through the Immigration and Nationality Act ("INA"), and other federal statutes.[5, 6] Defendants[7] oppose the LULAC and Gregorio T. motions on the grounds that Proposition 187 is not preempted and, alternatively, that if any portion of the initiative is preempted, the remaining portions are valid and must be upheld.

4. In February 1995, Defendants Wilson, Belshe and Anderson brought a motion for abstention, or in the alternative, to dismiss for failure to state a claim. Lungren joined in the motion for abstention and also moved to dismiss. In March 1995, the Court denied these motions and set this case for trial.

5. The following parties joined in LULAC's motion: Defendant San Diego Unified School District; defendant and amicus curiae Los Angeles Unified School District; and plaintiffs-intervenors Catholic Hospitals and Islamic Center.

The following parties joined in Gregorio T.'s motion: Carlos P. and Ayala plaintiffs; plaintiffs-intervenors City of Los Angeles, CTA, Catholic Hospitals, and Islamic Center; and defendant and amicus curiae Los Angeles Unified School District.

6. Catholic Hospitals and Islamic Center brought independent motions for summary judgment motions based on preemption as well, on May 12, 1995 and May 16, 1995, respectively. Catholic Hospitals and Islamic Center each joined in the other's motion.

To the extent that those motions are brought on grounds other than those raised in the LULAC and Gregorio T. motions, they are denied. To the extent that those motions rely on the same arguments raised in the LULAC and Gregorio T. motions, those motions are granted in part and

The Court grants in part and denies in part the motions for summary judgment in accordance with the conclusions reached below. Because the Court's ruling with respect to these motions does not dispose of this case in its entirety, the preliminary injunction shall remain in effect until further order of the Court.

## I. *Purpose and Effect of Proposition 187*

Proposition 187 consists of ten sections: a preamble (section 1), a section pertaining to the amendment and severability of the initiative (section 10) and eight substantive sections (sections 2–9).[8] Within the eight substantive sections of the initiative, there are the following five types of provisions:

(1) provisions which require state officials to verify or determine the immigration status of arrestees, applicants for social services and health care, and public school students and their parents, by either classifying persons based on state-created categories of immigration status (the "classification" provisions) or verifying immigration status by ref-

denied in part in accordance with the ruling set forth in this Opinion.

7. For the purposes of this Opinion, "defendants" means all named defendants except for the following, who do not oppose the plaintiffs' motions: (1) the defendants who joined in the motions for summary judgment (listed in footnote 5); (2) the Regents of the University of California, who filed a notice of non-opposition to all motions for summary judgment filed herein; (3) Eastin, who stipulated to the entry of summary judgment against her on July 28, 1995; and (4) the State Board of Education, which adopted a resolution declaring neutrality in this litigation on November 21, 1994.

8. The eight substantive sections of the statute are codified as follows: Section 2 is codified at Cal.Penal Code § 113. Section 3 is codified at Cal.Penal Code § 114. Section 4 is codified at Cal.Penal Code § 834b. Section 5 is codified at Cal.Welf. & Inst.Code § 10001.5. Section 6 is codified at Cal.Health & Safety Code § 130. Section 7 is codified at Cal.Educ.Code § 48215. Section 8 is codified at Cal.Educ.Code § 66010.8.

For the purposes of this Opinion, the initiative's provisions are referred to by their initiative section numbers rather than by their California code section numbers (i.e., Cal.Penal Code § 834b(a) is referred to as "section 4(a)").

erence to federal immigration laws (the "remaining verification" provisions) (Prop. 187 §§ 4(b), 5(b), (c); 6(b), (c); 7(a)–(e); 8(a)–(c)) [9];

(2) provisions which require state officials to notify individuals that they are apparently present in the United States unlawfully and that they must "either obtain legal status or leave the United States" (the "notification" provisions) (Prop. 187 §§ 4(b)(2); 5(c)(2); 6(c)(2));

(3) provisions which require state agencies to report immigration status information to state and federal authorities, and to cooperate with the INS regarding persons whose immigration status is suspect (contained in Sections 4–9) (the "cooperation/reporting" provisions) (Prop. 187 §§ 4(b)(3); 5(c)(3); 6(c)(3); 7(e); 8(c); 9);

(4) provisions which require facilities to deny social services, health care services and public education to individuals based on immigration status (the "benefit denial" provisions) (Prop. 187 §§ 5(b), (c)(1); 6(b), (c)(1); 7(a)–(c); 8(a)–(b)); and

(5) criminal penalties for falsifying immigration documents (Prop. 187 §§ 2, 3).

The full text of the initiative is set forth in Appendix A.

The initiative has a dual purpose and effect. The classification, notification and cooperation/reporting provisions taken together constitute a regulatory scheme designed to deter illegal aliens from entering or remaining in the United States by (1) detecting those persons present in the United States in violation of either state-created criteria for lawful immigration status or federal immigration laws; (2) notifying those persons of their purported unlawful status and ordering them to obtain legal status or leave the country; and (3) maintaining a system of reporting and cooperation between state and federal agencies to effect the removal of those persons. These provisions cannot be read except as a regulatory scheme; and indeed, defendants have not seriously urged any other reading. While the benefits denial provisions also have the purpose of deterring illegal aliens from entering or remaining in the United States, and arguably may be viewed as part of the same regulatory scheme, they have the additional purpose of forbidding the use of public funds to provide social services, health care and education to persons deemed to be present in the United States illegally.

## II. *Severability of the Initiative*

■ In determining the validity of Proposition 187, the Court is mindful of its obligation to uphold the initiative to the fullest extent possible. California law holds that "all presumptions favor the validity of initiative measures and mere doubts as to validity are insufficient." *Legislature v. Eu*, 54 Cal.3d 492, 501, 286 Cal.Rptr. 283, 287, 816 P.2d 1309, 1313 (1991). Initiatives "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." *Id.* A finding that a section, subsection or subpart of Proposition 187 is preempted by federal law does not end the Court's inquiry with respect to the validity of the initiative. Rather, a finding that any provision is preempted requires the Court to determine whether that provision is severable from the balance of the initiative so that the remainder may take effect. *See Calfarm Ins. Co. v. Deukmejian*, 48 Cal.3d 805, 821, 258 Cal. Rptr. 161, 170, 771 P.2d 1247, 1255 (1989) (a holding that a subdivision of an initiative is invalid under the state and federal Constitutions requires a determination as to whether the invalid provision is severable from the initiative). Whether any preempted provision of Proposition 187 is severable from the

---

**9.** The verification provisions are of two types. The first type requires state agents to classify persons based on three state-created categories of "legal status" without any reference to federal immigration laws. Specifically, state agents must determine who is a "citizen" and who is "lawfully admitted" as a permanent resident or for a temporary period of time. §§ 5(b); 6(b); 7(d). These provisions are referred to collective-ly as "classification" provisions. The remaining verification provisions contain a "catch-all" category exempting from Proposition 187's denial of benefits, notification and reporting provisions persons who are otherwise lawfully present in the United States under federal law. §§ 4(b)(1); 5(c); 6(c); 7(b), (c); 8(b). These provisions are referred to collectively as the "remaining verification" provisions.

remainder of the initiative is determined pursuant to California law. *National Broiler Council v. Voss,* 44 F.3d 740, 748 n. 12 (9th Cir.1994).

■ Section 10 of Proposition 187 provides:

In the event that any portion of this act or the application thereof to any person or circumstance is held invalid, that invalidity shall not affect any other provision or application of the act, which can be given effect without the invalid provision or application, and to that end the provisions of this act are severable.

" 'Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable ... [citation]' " *Calfarm,* 48 Cal.3d at 821, 258 Cal.Rptr. at 170, 771 P.2d at 1256 (citation omitted). The existence of a severability clause does not conclusively resolve the severability inquiry, however. Rather, "[t]he final determination depends on whether 'the remainder ... is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute ...' and 'is not so connected with the rest of the statute as to be inseparable.' " *Santa Barbara Sch. Dist. v. Superior Court,* 13 Cal.3d 315, 331, 118 Cal.Rptr. 637, 650, 530 P.2d 605, 618 (1975) (citations omitted).

■ California courts have prescribed three criteria by which a reviewing court must assess the severability of invalid provisions of statutes. In order to be severable, "the invalid provision must be grammatically, functionally, and volitionally separable." *Calfarm,* 48 Cal.3d at 821, 258 Cal.Rptr. at 170, 771 P.2d at 1256. A provision is grammatically severable if "it constitutes a distinct and separate provision ... which can be removed as a whole without affecting the wording of any other provision," 48 Cal.3d at 822, 258 Cal.Rptr. at 170, 771 P.2d at 1256, or "where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase or even single words." *Santa Barbara Sch. Dist.,* 13 Cal.3d at 330, 118 Cal. Rptr. at 649, 530 P.2d at 617. However, where "the defect cannot be cured by excising any word or group of words, the problem is quite different," and severance is inappropriate. *Santa Barbara Sch. Dist.,* 13 Cal.3d at 331, 118 Cal.Rptr. at 649, 530 P.2d at 617.

■ A provision is functionally severable if the remaining provisions can "stand on their own," are capable of "separate enforcement," *People's Advocate, Inc. v. Superior Court,* 181 Cal.App.3d 316, 331–32, 226 Cal.Rptr. 640, 649 (1986), can be "given effect," *Raven v. Deukmejian,* 52 Cal.3d 336, 355, 276 Cal. Rptr. 326, 338, 801 P.2d 1077, 1089 (1990), or can "operate ... independently" of the invalid provisions. *Eu,* 54 Cal.3d at 535, 286 Cal.Rptr. at 310, 816 P.2d at 1336. The remaining provisions must neither be "rendered vague" by the absence of the invalid provisions nor "inextricably connected to them by policy considerations." *People's Advocate,* 181 Cal.App.3d at 332, 226 Cal.Rptr. at 649.

■ Finally, an invalid provision is volitionally severable if the remaining provisions "would likely have been adopted by the people had they foreseen the invalidity" of the challenged provision, or if the provision was not "so critical to the enactment of [the initiative] that the measure would not have been enacted in its absence." *Calfarm,* 48 Cal.3d at 822, 258 Cal.Rptr. at 170, 771 P.2d at 1256. Stated differently, "[t]he test [for volitional severability] is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." *People's Advocate,* 181 Cal.App.3d at 333, 226 Cal.Rptr. at 650. Under the volitional severability test, even if the " 'heart of [the] [p]roposition' " is found invalid, if some " 'substantive provisions remain,' " the invalid part should be severed to enforce the valid provisions and achieve at least "some substantial portion of [the voters'] purpose." *Gerken v. Fair Political Practices Co.,* 6 Cal.4th 707, 714–15, 25 Cal.Rptr.2d 449, 457, 863 P.2d 694, 702 (1993) (*quoting City of Woodlake v. Logan,* 230 Cal.App.3d 1058, 1070, 282 Cal.Rptr. 27 (1991); *Santa Bar-*

*bara Sch. Dist.,* 13 Cal.3d at 332, 118 Cal. Rptr. at 650, 530 P.2d at 618).

Plaintiffs contend that Proposition 187 is not severable because its "pervasive unconstitutionality" leaves nothing to salvage. In addition, they argue that the provisions of the initiative fail to meet the three criteria for severability. They contend, for example, that the classification provisions are not grammatically severable because their absence would render the remaining verification provisions unintelligible. They argue that none of the verification provisions are functionally severable because their absence would render the denial of benefits provisions inoperable. Finally, they argue that the notification and reporting provisions are not volitionally severable from the benefits denial provisions because the intention of the electorate in passing the initiative was to enact a comprehensive scheme to "stop illegal aliens," and severing the notification and reporting provisions to salvage the benefits denial provisions would frustrate the electorate's intent.

Defendants counter that the initiative meets all three severability tests. That is, defendants argue that the initiative is volitionally severable because the severability clause reflects the electorate's intent to accept the implementation of any valid provisions notwithstanding the invalidation of others, grammatically severable because each section, subsection and subpart of the initiative can be severed from the others without rendering remaining sections unintelligible and functionally severable because each section, subsection and subpart is capable of operating independently from the others.

■ Before analyzing the severability of each of the challenged provisions of Proposition 187, two general comments on the grammatical and volitional severability of the initiative as a whole are warranted. First, defendants are correct that each of Proposition 187's ten sections, and their respective subsections, is a distinct grammatical unit and thus is capable of being severed from the other sections and subsections without affecting the wording of any other section or rendering what remains unintelligible. Accordingly, any section or subsection within Proposition 187 which is found to be invalid is grammatically severable from the remainder of the initiative.

■ Second, defendants are also correct that the initiative is volitionally severable. Plaintiffs' contention to the contrary—that, for example, the denial of benefits or criminal penalties provisions would not have been adopted had the people foreseen the success of challenges to the reporting and notification provisions—is unavailing. Proposition 187's declaration of intent explicitly states that a substantial purpose of the initiative is to "prevent illegal aliens in the United States from receiving benefits or public services in the State of California." § 1. Elsewhere in the initiative it is stated that it is "the intention of the People of California that only citizens of the United States and aliens lawfully admitted ... may receive the benefits" of public social services, health care, and education. §§ 5(a); 6(a); 7(a); 8(a). Further, "[e]ven though ... the full purpose of [the initiative] cannot be realized, it seems eminently reasonable to suppose that those who favor the proposition would be happy to achieve at least some substantial portion of their purpose." *Santa Barbara Sch. Dist.,* 13 Cal.3d at 331–32, 118 Cal.Rptr. at 650, 530 P.2d at 618. It cannot be disputed that the denial of benefits to "illegal aliens" (in sections 5 through 8) and the criminalization of the manufacture and use of false immigration documents (in sections 2 and 3) serve a significant part of the initiative's purpose. The Court is therefore convinced that if the voters had known that some of the initiative's provisions would be held invalid, they would have preferred the implementation of the remaining portions, rather than the invalidation of the entire initiative. Any provisions of Proposition 187 found to be invalid are volitionally severable from the remainder.

Thus, the provisions of Proposition 187 which are preempted must be severed from the initiative. A copy of the initiative as severed in accordance with this Opinion follows in Appendix B. The Court's preemption analysis follows.

### III. Whether Proposition 187 is Preempted Under Federal Law

The question of whether provisions of Proposition 187 are preempted by federal law is governed by the Supreme Court's decision in *De Canas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (California statute prohibiting an employer from knowingly employing an alien who is not entitled to lawful residence in the United States held not preempted under federal law). In *De Canas*, the Supreme Court set forth three tests to be used in determining whether a state statute related to immigration is preempted. Pursuant to *De Canas*, if a statute fails any one of the three tests, it. is preempted by federal law.

■ Under the first test, the Court must determine whether a state statute is a "regulation of immigration." Since the "[p]ower to regulate immigration is unquestionably exclusively a federal power," *id.* at 354, 96 S.Ct. at 936, any state statute which regulates immigration is "constitutionally proscribed." *Id.* at 356, 96 S.Ct. at 936.

■ Under the second test, even if the state law is not an impermissible regulation of immigration, it may still be preempted if there is a showing that it was the "clear and manifest purpose of Congress" to effect a "complete ouster of state power—including state power to promulgate laws not in conflict with federal laws" with respect to the subject matter which the statute attempts to regulate. *Id.* at 357, 96 S.Ct. at 937. In other words, under the second test, a statute is preempted where Congress intended to "occupy the field" which the statute attempts to regulate.

■ Under the third test, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 363, 96 S.Ct. at 940 (*citing Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Stated differently, a statute is preempted under the third test if it conflicts with federal law making compliance with both state and federal law impossible. *Michigan Canners & Freezers v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963).

### A. Whether Proposition 187 Constitutes an Impermissible Regulation of Immigration.

■ The federal government possesses the exclusive power to regulate immigration. *De Canas*, 424 U.S. at 354–355, 96 S.Ct. at 936 ("Power to regulate immigration is unquestionably exclusively a federal power.") That power derives from the Constitution's grant to the federal government of the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4., and to "regulate Commerce with foreign Nations." *Id.*, cl. 3. In addition, the Supreme Court has held that the federal government's power to control immigration is inherent in the nation's sovereignty. *See, e.g., Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892) (recognizing inherent power of sovereign nation to control its borders); *Plyler v. Doe*, 457 U.S. 202, 225, 102 S.Ct. 2382, 2399, 72 L.Ed.2d 786 (1982) ("Drawing upon [its Article I, section 8] power, upon its plenary authority with respect to foreign relations and international commerce, and upon the inherent power of a sovereign to close its borders, Congress has developed a complex scheme governing admission to our Nation and status within our borders"); *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments ...'" (citation omitted)).

Congress has exercised its power over immigration in the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (the "INA"). The INA is a comprehensive regulatory scheme which regulates the authorized entry, length of stay, residence status and deportation of aliens. *See Gonzales v. City of Peoria*, 722 F.2d 468, 474–75 (9th Cir.1983) (recognizing that the regulatory scheme created by the INA is so pervasive as to be consistent with the exclusive federal power

over immigration). The INA delegates enforcement duties to the Immigration and Naturalization Service ("INS").

■ Because the federal government bears the exclusive responsibility for immigration matters, the states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948). *See also Plyler v. Doe*, 457 U.S. 202 at 225, 102 S.Ct. 2382 at 2399, 72 L.Ed.2d 786 (1982) ("The States enjoy no power with respect to the classification of aliens." (*citing Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941))).

In *De Canas*, in reasserting the rule that "[p]ower to regulate immigration is unquestionably exclusively a federal power," the Supreme Court emphasized that the mere fact that a state statute pertains to aliens does not require a finding that it is preempted: "the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se preempted by this constitutional power ..." 424 U.S. at 355, 96 S.Ct. at 936. The Court stressed that "the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." 424 U.S. at 355, 96 S.Ct. at 936.

■ In this case, plaintiffs urge that the entirety of Proposition 187 constitutes a scheme to regulate immigration and is therefore preempted. They assert that the initiative as a whole is a regulation of immigration because it forces state employees to make judgments as to an individual's immigration status, gives them the power to effectuate removal of immigrants from the country and thereby establishes California's own INS. Defendants counter that pursuant to *De Canas*, "regulation of immigration" has a "narrow, technical meaning"; that a facial challenge to this statute requires a "painstaking line-by-line analysis" of the statute; and that

such analysis reveals that, standing alone, none of Proposition 187's individual sections or subsections is "essentially a determination of who should or should not be admitted into the country and on what terms those lawfully admitted can remain here." *De Canas*, 424 U.S. at 355, 96 S.Ct. at 936.

In *De Canas*, the statute at issue provided that "[n]o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." *Id.* at 352 n. 1, 96 S.Ct. at 935; Cal.Lab.Code § 2805. Noting that in that case, California had "sought to strengthen its economy by adopting federal standards in imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country," the Supreme Court found that the statute did not constitute an immigration regulation, but rather, had only "some purely speculative and indirect impact on immigration." *Id.* at 355, 96 S.Ct. at 936.

Unlike the statute at issue in *De Canas*, various of Proposition 187's provisions have much more than a "purely speculative and indirect impact on immigration." Indeed, Proposition 187's verification, notification and cooperation/reporting requirements directly regulate immigration by creating a comprehensive scheme to detect and report the presence and effect the removal of illegal aliens. The scheme requires state agents to question all arrestees, applicants for medical and social services, students, and parents of students about their immigration status; to obtain and examine documents relating to the immigration status of such persons; to identify "suspected" "illegal" immigrants present in California; to report suspected "illegal" immigrants to state and federal authorities; and to instruct people suspected of being in the United States illegally to obtain "legal status" or "leave the country." Thus, Proposition 187's scheme has a direct and substantial impact on immigration.

Further, certain of Proposition 187's provisions require state agents to make *independent* determinations of who is subject to the initiative's benefits denial, notification and

cooperation/reporting provisions and who may lawfully remain in the United States. Unlike the statute at issue in *De Canas,* which adopted *federal standards* to determine whether an individual's immigration status subjected an employer to liability, Proposition 187's classification provisions create an entirely *independent* set of criteria by which to classify individuals based on immigration status. *See, e.g.,* Prop. 187 §§ 5(b); 6(b); 7(d).

On the other hand, the benefits denial provisions of sections 5 through 8 may be likened to the statute at issue in *De Canas.* While the denial of benefits to persons not lawfully present in the United States may indirectly or incidentally affect immigration by causing such persons to leave the state or deterring them from entering California in the first place, such a denial does not amount to a "determination of who should or should not be admitted into the country." *De Canas,* 424 U.S. at 355, 96 S.Ct. at 936. Accordingly, the benefits denials provisions are not impermissible regulations of immigration and thus are not preempted under the first *De Canas* test.

It is true, as plaintiffs argue, that benefits denial can only occur after an applicant's legal status has been "determined." That is, absent some verification process, eligibility for benefits based on immigration status would be impossible. Moreover, state agents are unqualified—and also unauthorized—to make independent determinations of immigration status. Congress has exclusively reserved that power to the INS and to immigration judges pursuant to the INA. *See* 8 U.S.C. § 1252(b); 8 C.F.R. § 242.1(a). Indeed, determinations of immigration status by state agents amounts to immigration regulation whether made for the purposes of notifying aliens of their unlawful status and reporting their presence to the INS or for the limited purpose of denying benefits.

Defendants contend that because state agents are required to and do make determinations of immigration status in administering benefits under certain federal-state cooperative programs, eligibility for which Congress has conditioned on lawful immigration status, such determinations may also be made by state agents for purposes of denying benefits under Proposition 187. Indeed, the Systematic Alien Verification for Entitlements program ("SAVE"), 42 U.S.C. § 1320b–7, is an existing federal eligibility system used to verify status for various federal-state cooperative programs such as the Aid to Families with Dependent Children ("AFDC"), Food Stamps, Medicaid and Unemployment Compensation programs under which eligibility is dependent on lawful immigration status. *See* 42 U.S.C. § 1320b–7(b)(1) and 45 C.F.R. § 233.50 (AFDC); 42 U.S.C. §§ 1320b–7(b)(2) and 1396b(v)(1) (Medicaid); 7 U.S.C. § 2015(f) and 42 U.S.C. § 1320b–7(b)(4) (Food Stamps). These benefits programs require state agents to *verify* immigration status by accessing federal immigration status information through SAVE. In administering state-federal cooperative benefits programs, however, state agents perform a ministerial rather than a discretionary function in verifying immigration status. That is, state agents merely access INS information to verify an applicant's immigration status—no independent determinations are made and no state-created criteria are applied. A requirement that state agents merely *verify* immigration status by referring to INS information is much different from a requirement that state agents actually make determinations as to who is, and who is not, deportable under federal law. Permitting state agents, who are untrained—and unauthorized—under federal law to make immigration status decisions, incurs the risk that inconsistent and inaccurate judgments will be made. On the other hand, requiring state agents simply to verify a person's status with the INS involves no independent judgment on the part of state officials and ensures uniform results consistent with federal determinations of immigration status.

The benefits denial provisions of Proposition 187 may therefore be implemented without impermissibly regulating immigration if state agencies, in verifying eligibility for services and benefits, rely on *federal* determinations of status made by the INS and accessible through SAVE. Because state regulations implementing Proposition 187 could require state agencies to verify immigration

status through reference to INS information and could deny state actors discretion to apply non-federal criteria for benefits eligibility, Proposition 187's benefits denial provisions are not an impermissible regulation of immigration and therefore withstand scrutiny under the first *De Canas* test.

Accordingly, the classification, notification and cooperation/reporting provisions of the initiative, contained in sections 4 through 9 and in the preamble, which are aimed solely at regulating immigration, are preempted. The provisions which have the permissible purpose and effect of denying state-funded benefits to persons who are unlawfully present in the United States are not a regulation of immigration and therefore survive the first *De Canas* test.

### 1. Section 4

Section 4, entitled "Law Enforcement Cooperation with the INS," requires law enforcement agencies to verify the legal status of every arrestee who is "suspected of being present in the United States in violation of federal immigration laws" by "questioning the person" and "demanding documentation." § 4(b)(1). Section 4 requires law enforcement agencies to "[n]otify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that … he or she must either obtain legal status or leave the United States. § 4(b)(2). In addition, section 4 requires the agency to "[n]otify the Attorney General … and the [INS] of the apparent illegal status." § 4(b)(3). Finally, section 4 requires law enforcement agencies to "fully cooperate with the [INS] regarding any person who is arrested if he or she is suspected" of being in the United States illegally and prohibits any local governmental agency from limiting such cooperation in any way. § 4(a), (c).

■ Under the first *De Canas* test, a state may not require its agents to (i) make independent determinations of who is and who is not in this country "in violation of immigration laws;" (ii) report such determinations to state and federal authorities; or (iii) "cooperate" with the INS, solely for the purpose of ensuring that such persons leave the country. The sole stated purpose and the sole effect of section 4 is to impermissibly regulate immigration. Accordingly, section 4 is entirely preempted by federal law under the first *De Canas* test.

### 2. Sections 5 and 6

Section 5, entitled "Exclusion of Illegal Aliens from Public Social Services," and section 6, entitled, "Exclusion of Illegal Aliens from Publicly Funded Health Care," differ from section 4 in that their stated purpose and effect is not solely to ensure the ouster of persons suspected of being in this country unlawfully. Rather, they have the additional purpose and effect of excluding persons from obtaining public social and health care services. To the extent that state actors deny benefits to persons based on determinations by federal authorities that those individuals are deportable pursuant to federal law, benefits denial is not a direct regulation of immigration, but rather, has only the possible indirect effect of deterring "illegal" aliens from coming to California or causing them to leave.

■ Sections 5 and 6 do not merely deny benefits, however. Both sections contain classification, notification and cooperation/reporting provisions which are roughly parallel to those contained in section 4. *See* §§ 5(b), (c)(1), (c)(2); 6(b), (c)(1), (c)(2). These provisions are entirely unnecessary to the implementation of the benefits denial provisions. That is, without those three sets of provisions, *both sections 5 and 6 still require public entities and publicly-funded health care facilities to deny benefits to persons who are determined to be in the United States in violation of federal law. See* §§ 5(c)(1), 6(c)(1).[10]

---

10. As explained above, the benefits denial provisions in subsection (c) of sections 5 and 6 may be constitutionally implemented only through a regulation whereby state agents do not *themselves* determine a whether a person is lawfully present in the United States and only verify a person's immigration status for benefits denial purposes by relying on determinations made by the INS and accessible through SAVE.

The classification, notification and cooperation/reporting provisions in sections 5 and 6 add nothing to the statute except that they expand Proposition 187's impermissible scheme of immigration regulation—by requiring agents of the state (i) to make independent determinations of who is and who is not "lawfully admitted" in this country, based on state-created criteria (subsection (b)); and (ii) to report such determinations to state and federal authorities solely for the purpose of ensuring that such persons leave the country (subsections (c)(1) and (c)(2)).

■■■■ In addition, subsection (b) is an impermissible immigration regulation because, unlike the statute at issue in *De Canas,* the classification of persons as (1) citizens; (2) lawfully admitted as a permanent resident or (3) lawfully admitted for a temporary period *is not in any way tied to federal standards.* Thus, the state has created its *own* scheme setting forth who is, and who is not, entitled to be in the United States. As discussed below, the INS's standards for who is and who is not deportable are entirely different from those set forth in subsection (b). *See, e.g.,* 8 U.S.C. § 1251(a). As the Supreme Court held in *De Canas,* a state cannot, on its own, determine who is or is not entitled to be present in the United States. *See De Canas,* 424 U.S. at 355, 96 S.Ct. at 936.

Defendants contend that the Court should construe the term "lawfully admitted" in subsections (b)(1) and (b)(2) as applying "to persons who are *present* in the United States unlawfully, not to those who *entered* unlawfully." They argue that such a construction avoids preemption, because "lawfully present" is an immigration status standard applied under the INA, and thus the classification of persons required under subsection (b) of sections 5 and 6 would be tied to federal standards, rather than to state-created criteria. This argument is not persuasive. As

plaintiffs point out, the term "lawfully admitted" has its *own* established meaning under the INA. *See* 8 U.S.C. § 1182.[11] Thus, there is no basis for the Court to replace the word "admitted," with the word "present." Moreover, even if the Court were to do so, the statute still would not be tied to federal standards.

The impermissible classification, notification, and cooperation/reporting requirements of sections 5 and 6, subsections (b), (c)(2), and (c)(3), are therefore preempted.

■■■ In the absence of the scheme created by those sections, the remaining substantive provisions of sections 5 and 6 are contained in subsections 5(c)(1) and 6(c)(1). Those provisions, standing alone, require that state agents deny benefits to persons who are determined or suspected to be "in the United States in violation of federal law." Defendants contend that (c)(1) is not an immigration regulation because, absent the classification, notification, and reporting provisions, (c)(1)'s effect is solely to deny benefits—not to determine who should or should not be permitted to remain in the United States.

Indeed, in the absence of subsections (b), (c)(2) and (c)(3), subsection (c)'s verification component is utilized solely for the purpose of denying benefits. Unlike subsection (b), subsection (c)(1)'s verification component is tied to federal immigration standards, so that under subsection (c)(1), benefits are denied based on an individual's federally-determined immigration status and not on any independent criteria developed by the state.

Plaintiffs counter that (c)(1) is not tied to any federal or state immigration standards and is therefore preempted because, on its face, subsection (c)(1) would deny benefits not only to aliens who are deportable under federal immigration law but also to aliens who have, for example, failed to file their tax

---

11. Those lawfully "admitted" under federal immigration law are those who an immigration officer determines to satisfy admissibility criteria at the time of entry. 8 U.S.C. § 1182. Thus, it is likely that there are aliens who are lawfully present in the United States, but who were never lawfully "admitted" as federal law defines that term. These include, for example, persons who

entered illegally but then were granted asylum under 8 U.S.C. § 1158. Conversely, some aliens who were lawfully "admitted" under the INA, but have overstayed their visas, may no longer be lawfully present. The plain language of subsection (b)(3) would include these aliens while the construction urged by defendants would exclude them.

returns, because technically such persons would be "alien[s] in the United States in violation of federal law." This is a tortured reading of the provision. The Court is obliged to uphold subsection (c)(1) if there is *any* construction of the provision which is constitutional. Clearly (c)(1) can, and should, be understood to require denial of benefits solely to deportable aliens (i.e., those aliens whose presence in the United States is in violation of federal immigration law). The Court must conclude that subsection (c)(1) denies benefits based on federal determinations of immigration status and is not an impermissible regulation of immigration. Such benefits denial is not preempted under the first *De Canas* test.

■■■ One additional problem remains. Subsection (c)(1) requires state agents to deny benefits to any individual who is "determine[d] or "reasonably suspect[ed]" to be present in the United States in violation of federal law. Thus, on its face, (c)(1) requires state actors to make independent determinations as to whether a person is deportable under federal law. As discussed above, under the first *De Canas* test, state actors may not make independent determinations as to persons' immigration status. Only the INS can make such determinations, and so (c)(1) may survive only if benefits are denied only to those persons determined to be deportable by the *INS*. This problem is not irremediable, however. If the words "or reasonably suspects, based on the information provided to it," are severed from the subsection (c), sections 5 and 6 no longer would deny benefits to persons who are merely suspected by a state agent, rather than determined by the INS, to be deportable. And those words indeed are grammatically, functionally, and volitionally severable. The language "or reasonably suspects, based on the information provided to it," is grammatically severable, since when it is omitted, the remaining language makes sense. The offending language is also functionally severable, because denial of benefits can be implemented in its absence. That is, a person can be denied benefits if the administrating agent "determines," rather than merely "reasonably suspects . . ." that the person is present in the country in violation of federal laws. Finally, the "reasonably suspects" language is volitionally severable because the severability clause evidences the intent of the electorate to permit the severance of offending portions, and because it cannot be argued that the language was crucial to the passage of the initiative.

Even in the absence of the "reasonably suspects" language, however, it is still possible that under subsection (c)(1) state actors could be required to deny benefits based on their own independent determinations as to persons' immigration status. To avoid this result, the state could implement a regulation requiring officials to verify eligibility for services and benefits by accessing INS determinations of individuals' immigration status through the SAVE system. If the "reasonably suspects" language is omitted, and a regulation implementing the benefits denial provisions required state agencies to utilize INS determinations in denying benefits, subsection (c)(1) would not impermissibly regulate immigration. It would then withstand scrutiny under the first *De Canas* test.

The question remains whether the invalid provisions of sections 5 and 6 are severable from the remainder of the initiative. Plaintiffs contend that subsections (b), (c)(2) and (3) are not functionally severable from the remaining provisions in sections 5 and 6 and that a finding that subsections (b), (c)(2) and (c)(3) are preempted requires a finding that *all* of sections 5 and 6 are preempted. However, as set forth above, subsection (c)(1) can operate independently as a benefits denial provision absent the impermissible immigration regulation scheme. Therefore, subsections (b), (c)(2) and (c)(3) are functionally severable from the initiative. Because it is reasonable to conclude that the electorate would have preferred the implementation of the benefits denial provisions rather than the invalidation of the entire initiative had they foreseen the invalidity of the classification, notification and cooperation/reporting provisions, subsections (b), (c)(2) and (c)(3) are volitionally severable. Finally, subsection (c)(1) makes grammatical sense absent the severed provisions. Accordingly, subsections (b), (c)(2) and (c)(3) are severable.

### 3. Section 7

Section 7 is entitled "Exclusion of Illegal Aliens From Public Elementary and Secondary Schools." Like sections 5 and 6, section 7 contains classification, notification and cooperation/reporting requirements that, taken together, serve only to further the scheme to regulate immigration and are unnecessary to the denial of public education.

In section 7, subsections (a) through (c) require schools to verify the immigration status of children for the purposes of denying access to public elementary and secondary education. Subsection (d) requires verification of the immigration status of *parents* of school children. Subsection (e) requires school districts to report the "illegal" status of any parent, guardian, enrollee or pupil to state agencies and the INS. Subsection (f) requires school districts to "fully cooperate" in "accomplish[ing] an orderly transition to a school in the child's country of origin."

Subsections (a), (b) and (c), together, assure that undocumented children will be denied access to public education. Subsection (d) is wholly unnecessary to implementing the denial of education mandated by section 7, because the state has no need to know the immigration status of *parents* in order to deny benefits to *children*. Like subsection (b) in sections 5 and 6, the only purpose and effect of subsections (d), (e), and (f) is to ensure that persons determined by the state to be in the United States unlawfully are "transitioned" to the "country of their origin." Subsections (d), (e) and (f) are part of an impermissible scheme to regulate immigration and are therefore preempted under the first *De Canas* test.

In any event, an analysis of section 7 under the rigors of the first *De Canas* test is not necessary to sustain the Court's ruling on these motions. In light of the United States Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), in which the Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits states from excluding undocumented alien children from public schools, section 7 in its entirety conflicts with and is therefore preempted by federal law.

### 4. Section 8

Subsection (a) of Section 8 prohibits public postsecondary educational institutions from providing education to persons who are not "authorized under federal law" to be in the United States. Subsection (b) requires such institutions to verify the immigration status of each person enrolled or attending to ensure that education is provided only to persons who are "authorized under federal law" to be in the United States. Subsection (c) requires admissions officers to report any persons who are "determined to be, or … under reasonable suspicion of being in the United States in violation of federal immigration laws" to state and federal authorities.

Subsection 8(c), like the reporting requirements in sections 5 and 6, cannot survive because it has no purpose other than to regulate immigration. On the other hand, subsections (a) and (b), like the denial of benefits in sections 5 and 6, are not regulations of immigration since they do not amount to determinations of who may and may not remain in this country. In the absence of subsection (c)'s reporting requirements, the verification components of subsections (a) and (b) are permissible because their only purpose is to determine who may and who may not receive postsecondary education. Also, the verification components of subsections (a) and (b) are tied to federal standards rather than to an impermissible state classification scheme. Because subsections (a) and (b) may be implemented by requiring state actors to rely on federal determinations rather than their own independent determinations of immigration status to deny public postsecondary education, subsections (a) and (b) are not preempted under the first *De Canas* test.

The final question is whether subsection (c) is functionally, volitionally and grammatically severable from the remaining provisions of section 8. Since the absence of the impermissible reporting requirements does not impair the state's ability to deny public post-secondary education, subsection (c) is functionally severable. Subsection (c) is grammatically severable because the removal of subsection (c) does not render the

remaining provisions of section 8 unintelligible. Finally, because it is reasonable to conclude that the electorate would have preferred the implementation of the remaining provisions rather than the invalidation of the entire section had they foreseen the invalidity of the cooperation/reporting provision, subsection (c) is volitionally severable.

### 5. Section 9

■ Section 9, entitled, "Attorney General Cooperation with the INS," requires the state attorney general to maintain records of, and to transmit to the INS, all reports received from state agencies pertaining to persons who are "suspected of being present in the United States in violation of federal immigration laws." This section is preempted under the first *De Canas* test because it has no purpose or effect except to further Proposition 187's impermissible immigration regulation scheme.

Section 9 is a separate and distinct section of Proposition 187, the severance of which does not impair the meaning of any remaining sections. It is, therefore, grammatically severable from the remainder of the initiative. Section 9 is functionally severable because it merely imposes additional reporting and record-keeping requirements beyond those required by the other sections of the initiative and eliminating these additional requirements does not impair the operation of the remaining sections. Finally, because the initiative's remaining benefits denial and criminal penalty provisions serve a substantial purpose of the electorate and would have been approved even absent the invalid provisions, section 9 is volitionally severable.[12]

### 6. Sections 2 and 3

■ Sections 2 and 3 criminalize making and using false documents "to conceal" the

"true citizenship or resident alien status" of a person. These provisions, though they may indirectly affect immigration in some way,[13] can hardly be said to be a "determination of who should or should not be admitted in to the country." Like the benefit denial provisions, the criminal penalties, criminalizing conduct that is dishonest and deceptive, are a legitimate exercise of the police power of the state.

Plaintiffs contend that criminal penalties are part of the overall immigration regulation scheme. Absent the verification, notification and cooperation/reporting elements of the initiative, however, the criminal penalties do not serve the impermissible goal of ensuring that "illegal" aliens leave the country. Accordingly, sections 2 and 3 are not preempted under the first *De Canas* test.

### B. *Whether Proposition 187 Is Preempted Because Congress Intended to Occupy the Field.*

Under the second *De Canas* test, even if a statute is not an impermissible regulation of immigration, it may still be preempted if there is a showing that Congress intended to "occupy the field" which the statute attempts to regulate. *De Canas,* 424 U.S. at 357, 96 S.Ct. at 937.

As discussed above, the Constitution commits the power to regulate immigration exclusively to the federal government. *De Canas,* 424 U.S. at 354, 356, 96 S.Ct. at 936. Congress has fully occupied the field of immigration regulation through enactment and implementation of the INA. *See, e.g., Gonzales v. City of Peoria,* 722 F.2d 468 (9th Cir.1983) ("We assume that the civil provisions of the [INA] regulating authorized en-

---

**12.** Section 1, entitled "Findings and Declaration," contains the following conclusion:

Therefore, the People of California declare their intention *to provide for cooperation between their agencies of state and local government with the federal government, and to establish a system of required notification by and between such agencies* to prevent illegal aliens in the United States from receiving benefits or public services in the State of California.

(emphasis added). Since Proposition 187's cooperation/reporting requirements are preempted,

the underlined portion of the preamble states an impermissible purpose. However, because the preamble has no practical effect absent the invalid substantive provisions, it is not subject to the preemption inquiry.

**13.** Plaintiffs have not provided the Court with any example of how such criminal penalties would even indirectly regulate immigration—and the Court is hard pressed to come up with any such examples on its own.

try, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration."). Since the classification, notification and cooperation/reporting requirements contained in sections 1 and 4 through 9 constitute a scheme to regulate immigration, those provisions are necessarily preempted under the second *De Canas* test as well.

Because the Court has determined that the benefits denial and criminal provisions in sections 2 and 3 are not impermissible regulations of immigration, the question remains whether these provisions are nevertheless preempted because Congress has intended to occupy the field on which they touch. Under the second *De Canas* test, the benefits denial provisions of sections 5 through 8 are preempted only if they regulate a field in which Congress intended a "complete ouster" of state power, even if a state regulation in that field is not in conflict with federal law. *See De Canas*, 424 U.S. at 356, 357, 96 S.Ct. at 936, 937. In *De Canas*, the Supreme Court defined the field on which the statute in question touched not as the broad field of immigration regulation, but, rather, the more narrow field of employment of illegal aliens. *Id.* Finding nothing in the INA which indicated Congressional intent to preclude state regulation touching on the employment of illegal aliens, the Court refused to "presume that Congress ... intended to oust state authority to regulate the employment relationship covered by the [statute]," and held that the statute was not preempted. *Id.* at 357, 96 S.Ct. at 937.

Similarly, the field on which Proposition 187's benefits denial provisions touch is not the broad field of immigration regulation but, rather, the public benefits field, specifically

alien eligibility for public benefits. Since nothing in the wording or legislative history of the INA "unmistakably confirms" an intent to oust state authority to regulate in the public benefits field, and because, as in *De Canas*, such an intent cannot be "derived from the scope and detail of the INA ... governing entry and stay of aliens," *id.* at 359, 96 S.Ct. at 938, Proposition 187's benefits denial provisions are not preempted under the second *De Canas* test.[14]

Likewise, the criminal provisions set forth in sections 2 and 3 are not preempted under the second *De Canas* test. Plaintiffs have made no showing whatsoever that Congress intended to effect a "complete ouster of state power—including state power to promulgate laws not in conflict with federal laws" with respect to criminalizing the falsification and use of forged identification documents. 424 U.S. at 357, 96 S.Ct. at 937. The field on which sections 2 and 3 touch is not the broad field of immigration regulation but, rather, the field of the criminal law as it relates to false documents. Since nothing in the legislative history of the INA, or in the INA itself, reveals an intent to oust state authority to criminalize the production or use of false identification, sections 2 and 3 are not preempted under the second *De Canas* test.

### C. Whether Proposition 187 Is Preempted Because It Directly Conflicts With Federal Law

The final inquiry under *De Canas* is whether, "although the INA contemplates some room for state legislation," *De Canas*, 424 U.S. at 363, 96 S.Ct. at 940, Proposition 187 is preempted in whole or in part because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citing *Hines v.*

---

14. The Court in *De Canas* also recognized that because certain federal legislation pertaining to farm labor contractor registration explicitly contemplated supplementary and consistent "appropriate State law and regulation," 7 U.S.C. § 2051, the INA could "not be taken as legislation by Congress expressing its judgment to have uniform federal regulations in matters affecting employment of illegal aliens, and therefore barring state legislation" such as the statute at issue. *De Canas*, 424 U.S. at 361–62, 96 S.Ct. at 939. Likewise in this case, the public benefits scheme

in this country is predominantly a cooperative federal-state effort based on voluntary state participation in federally-funded public benefits programs such as AFDC, Medicaid and Food Stamps and the states' optional provision of state funded public benefits not within the federal scheme. Thus, it cannot be said that the INA was unmistakably intended to preclude states from regulating, to the extent consistent with federal law, the provision of public benefits and services.

*Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Stated differently, the provisions of Proposition 187 may be preempted because they conflict with federal law making compliance with both state and federal law impossible. *Michigan Canners & Freezers,* 467 U.S. at 469, 104 S.Ct. at 2523.

1. Classification, Notification, and Reporting Provisions

 As set forth above, Proposition 187's classification, notification and cooperation/reporting provisions are preempted under the first and second *De Canas* tests because taken together, they constitute an impermissible scheme for the regulation of immigration. Those same provisions also violate the third *De Canas* test, because they are in conflict with federal laws governing the deportation of aliens.

The INA specifies an exclusive list of grounds for deportation, 8 U.S.C. § 1251(a), and provides that that procedure shall be the *"sole and exclusive procedure for determining the deportability of an alien."* 8 U.S.C. § 1252(b) (emphasis added). The procedure requires, among other things, that only a "special inquiry officer" (an immigration judge) may conduct deportation proceedings. *Id.* The INA's accompanying regulations require "[e]very proceeding to determine the deportability of an alien in the United States [to be] commenced by the filing of an order to show cause with the Office of the Immigration Judge." 8 C.F.R. § 242.1(a); 8 U.S.C. § 1252a. The authority to issue such orders is delegated to a discrete list of federal officers. *Id.* Only specified federal officials can commence deportation proceedings, and only an immigration judge in deportation proceedings can determine that an alien is deportable and order the alien to leave the United States. *Id.;* 8 U.S.C. §§ 1252(a), 1252(b). Then, after a "final order" of deportation issues, only the Attorney General may "effect the alien's departure from the United States." 8 U.S.C. § 1252(c).

Proposition 187's classification, notification and cooperation/reporting provisions directly contradict the INA's mandate that the procedure outlined in the INA "shall be the sole and exclusive procedure for determining the deportability of an alien." These provisions create a *new, wholly independent procedure,* pursuant to which state law enforcement, welfare, health care, and education officials—rather than federal officials and immigration judges—are required to determine the deportability of aliens and effect their deportation. The classification, notification and cooperation/reporting provisions delegate to state agents tasks which federal law delegates *exclusively* to federal agents. These provisions are in direct conflict with and are preempted by federal law.

2. Denial of Benefits Provisions

a. Conflicts based on classification and remaining verification provisions

Proposition 187 requires, for the implementation of its benefits denial provisions, that public social service agencies, public health care facility personnel, public school districts and postsecondary educational institutions classify or verify the immigration status of applicants for benefits and services.

 Plaintiffs argue that because the classification provisions define legal immigration status more narrowly than federal law, and because the remaining verification provisions require state agents to classify persons' immigration status based on "suspicion," those provisions will result in the denial of benefits to persons who fail to meet *state* criteria but are nevertheless lawfully present in the United States under *federal* law. The plaintiffs contend that both types of verification provisions are preempted under the third *De Canas* test.

Defendants argue that the initiative "does not set up a classification system" at all and that the classification provisions, like the remaining verification provisions which are tied to federal standards, should be construed as applying only to persons who are present in the United States in violation of federal immigration laws.

(1) The classification provisions

As discussed above, Proposition 187 establishes three state-created categories of lawful immigration status on which the denial of benefits is based. These categories define

persons as "legal" and entitled to receive benefits if they are citizens of the United States, aliens lawfully admitted as permanent residents and aliens lawfully admitted for a temporary period of time. *See* §§ 5(b)(1)–(3), 6(b)(1)–(3), 7(d)(1)–(3). These three categories, however, fail to recognize several *federal* categories of persons who are not citizens, not admitted as permanent residents and not admitted for a temporary period of time but who are nevertheless present in the United States, authorized to remain here and eligible for certain benefits in accordance with federal law. For example, federal law authorizes certain refugees,[15] asylees,[16] persons granted withholding of deportation,[17] parolees,[18] persons protected by "family unity" status,[19] persons present under temporary protected status,[20] persons granted deferred enforced departure ("DED"),[21] persons eligible for suspension or stay of deportation[22] and battered immigrant women and children[23] to remain in the United States permanently, indefinitely or temporarily. None of these categories of lawful immigration status is accounted for by Proposition 187's classification scheme.

Sections 5, 6 and 7 utilize this underinclusive classification scheme to deny benefits and services to persons who fail to meet state criteria for lawful immigration status but are lawfully present in the United States and entitled to receive benefits and services under federal law. Congress has conditioned eligibility for some federal-state cooperative benefits programs covered by sections 5 and 6 on lawful immigration status under federal immigration laws. For example, eligibility for the Medicaid, Aid to Families with Dependent Children ("AFDC") and Food Stamps programs depends on verification of immigration status through the SAVE system. In administering these programs, state agencies verify recipient immigration status by accessing INS information. Since some persons otherwise eligible for benefits under federal standards would be excluded by Proposition 187's underinclusive classification scheme, denying services based on the classification scheme conflicts with the existing federal eligibility system for programs administered under SAVE. This classification scheme, preempted under the first and second *De Canas* tests, is also preempted under the third *De Canas* test as used to deny social and health services under sections 5 and 6 and education under section 7.

**15.** 8 U.S.C. §§ 1101(a)(42), 1157. Refugees are persons determined by the INS to have been persecuted or to have a well founded fear of persecution based on race, religion, nationality, membership in a particular social group of political opinion.

**16.** 8 U.S.C. § 1101(a)(42)(A), 1158. Persons who meet the statutory definition of refugee are eligible for asylum and may apply for permanent residency after one year. Asylees are entitled to remain in the United States on an indefinite basis unless asylee status is revoked by the INS.

**17.** 8 U.S.C. § 1253(h). A person is eligible for withholding of deportation if her "life or freedom would be threatened in [the home] country on account of race, religion, nationality, membership in a particular social group, or political opinion.

**18.** 8 U.S.C. § 1182(d)(5). Persons paroled by the INS into the United States based on humanitarian or public interest considerations may be authorized for indefinite stays.

**19.** 8 C.F.R. § 242.6. The spouses and children of aliens legalized under the Immigration Reform and Control Act's ("IRCA") amnesty provisions are protected from deportation by family unity status.

**20.** 8 U.S.C. § 1254a. Aliens living in the United States may be granted temporary protected status where unsafe conditions in their countries of origin make it a hardship to return.

**21.** 57 Fed.Reg. 28700–28701 (1992). Salvadorans granted DED status that officially expired at the end of 1994 remain in the United States with the permission of the INS on the basis of family relationships, continuing eligibility for work authorization and other grounds.

**22.** 8 U.S.C. §§ 1105a(a)(3) (stay), 1254(a) (suspension). An alien found deportable and ordered deported by an immigration judge may be eligible for suspension or stay of deportation for emergent or humanitarian reasons.

**23.** 8 U.S.C. § 1154. The Violence Against Women Act of 1994 (Title IV of the Violent Crime Control and Law Enforcement Act of 1994) provides that battered immigrant women and children may become legalized by self-petition for immediate relative or second preference status under the INA or by application for suspension of deportation on the basis of abuse.

The question remains whether the impermissible classification scheme in subsection (b) of sections 5 and 6 and subsection (d) of section 7 is severable from the remainder of the initiative. The subsections are gramatically severable because their absence does not render the remaining subsections unintelligible. The subsections are functionally severable because the benefits denial provisions may be implemented by utilizing the remaining verification provisions in subsection (c) of sections 5 and 6 and subsections (b) and (c) of section 7 which bases denial of benefits and services on *federal* immigration standards. Finally, the subsections are volitionally severable because it cannot be said that voter approval of the initiative was dependent on any particular classification scheme as long as the effect was the denial of benefits and services to illegal aliens. Thus, subsection (b) of section 5 and 6 and subsection (d) of section 7 are preempted by federal law but may be severed from the remainder of the initiative.

(2) The remaining verification provisions

Subsection (c) of sections 5 and 6 provides that if any public entity "determines or reasonably suspects, based on the information provided to it," that an applicant for benefits or services is an "alien in the United States in violation of federal law," the entity shall deny the benefits or services. §§ 5(c), 6(c). Subsection (b) of sections 7 and 8 likewise calls for verification of status based on federal immigration standards by requiring school districts and postsecondary educational institutions to verify that students and/or parents are "authorized under federal law to be present in the United States." §§ 7(b), 8(b). Because these provisions require verification by reference to federal immigration standards, conflict with that law is not readily apparent. Because Congress conditions eligibility for benefits under the AFDC, Food Stamps and Medicaid programs on lawful immigration status and requires state agents to verify applicant eligibility by accessing INS information through the SAVE system, section 5's denial of benefits to persons "in the United States in violation of federal law"

does not conflict with or impede the objectives of federal law. Section 5 is not preempted to the extent that it applies to federally funded programs for which Congress has conditioned benefit eligibility on lawful immigration status.

■ Plaintiffs contend, however, that the verification procedure required by subsection (c) of sections 5 and 6, based on the reasonable suspicion of state agents, cannot be constitutionally implemented because denying benefits to those merely *suspected* of being present in violation of federal laws conflicts with federal law which entitles those lawfully present in the United States to the receipt of certain benefits. In other words, because benefits may be denied under Proposition 187 to individuals who are in fact lawfully present in the United States if the administering agent merely reasonably suspects they are present in violation of federal law, the verification procedure conflicts with and impedes the objective of federal law with respect to immigrant benefit eligibility.

Plaintiffs are correct. Because the only constitutional implementation of Proposition 187's benefits denial provisions would require state agents to utilize federal determinations of immigration status, and because a state agent's "reasonable suspicion" of unlawful immigrant status is not the same as a federal determination of immigration status, the "reasonably suspects" language conflicts with federal law. It is therefore preempted under the third De Canas test. The "reasonably suspects" language in subsection (c) may be severed from the remainder of subsection (c).

The remaining verification provisions in sections 7 and 8 pertaining to the denial of public education do not suffer from the same defect as their counterparts in sections 5 and 6 because public school authorities are merely required to *verify* a student's immigration status as lawful under federal law. No "reasonable suspicions" are involved. Because verification of immigration status by reference to INS information is permissible through programs such as SAVE, the remaining verification provisions of sections 7 [24]

---

**24.** Because all of Section 7 is necessarily preempted by the Supreme Court's decision in

*Plyler v. Doe* as discussed below, that Section 7's verification provision does not conflict with fed-

and 8 are not in conflict with federal law and are not preempted under the third *De Canas* test.

### b. Conflicts based on benefits denial provisions

As applied to federally-funded programs and federally-funded health care facilities, the benefits denial provisions of sections 5 and 6, even if implemented to deny benefits and services only to persons present in the United States in violation of federal immigration laws, appear to conflict with various federal laws. It is unclear, however, from the showing made here whether, under *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158–160, 98 S.Ct. 988, 994–995, 55 L.Ed.2d 179 (1978), these apparent conflicts render the denial of benefits provisions completely preempted or preempted only to the extent that they apply to federally-funded benefits. Moreover, even if the Court were to hold that the apparent conflicts with federal laws do not completely defeat the denial of benefits provisions, the defendants have made only a general representation to the Court that there are purely state-funded benefits and services to which the initiative could apply. Because the implications of *Ray* are unclear and because the Court is not convinced that there actually are any such wholly state-funded benefits programs and health care facilities, the Court declines to rule on whether the denial of benefits provisions are preempted. Nevertheless the Court sees several apparent conflicts between the operation of the benefits denial provisions and various federal laws.

### (1) Section 5

■ The remaining benefits denial provision of section 5 provides that "any public entity" shall not provide benefits or services to persons determined to be "alien[s] in the United States in violation of federal law." § 5(c)(1). By its plain language, section 5 applies to "any public entity" in the state of California and covers "public social services" or "benefits and services" administered by those entities. *Id.* "Public social services" is broadly defined under California law to include:

> those activities and functions of state and local government administered or supervised by the department [of Social Services] or the State Department of Health Services and involved in providing aid or services or both ... to those people of the state who, because of their economic circumstances or social condition, are in need thereof and may benefit thereby.

Cal.Welf. & Inst.Code § 10051. The Court concludes that section 5 broadly denies any and all aid, services and programs administered or supervised by the state departments of social and health services to persons without lawful immigration status under federal law. Accordingly, to the extent that section 5 would deny public social services to persons entitled to receive them under federal law, section 5 conflicts with federal law. Plaintiffs argue that section 5's denial of public social services conflicts with federal law regardless of whether eligibility is based on the impermissible underinclusive classification scheme in subsection (b), or on federal immigration standards referenced in subsection (c), because Proposition 187 conditions eligibility for some federal-state cooperative programs on lawful immigration status where the federal legislation authorizing such programs imposes no such requirements. Specifically, plaintiffs contend that there is a conflict between section 5 and the Women, Infants, and Children program [25] and child welfare services [26] because benefits are avail-

---

eral law cannot save it from preemption on other grounds.

**25.** 42 U.S.C. § 1786; 7 C.F.R. § 246 (providing supplemental food, nutrition, counseling and health care referral for low-income pregnant women, new mothers, infants and children who are at "nutritional risk").

**26.** Child welfare services are defined under federal law as public social services directed toward child well-being, including programs to protect and promote child welfare generally, to prevent or remedy neglect, abuse, exploitation and delinquency of children, to restore children to their families after protective removals and to place children and assure adequate care in suitable adoptive or other homes. *See* 42 U.S.C. § 625. Federal grants are made to qualified state child welfare service programs. *See* 42 U.S.C. §§ 601 et seq.; 42 U.S.C. §§ 620 et seq.; 42 U.S.C. §§ 670 et seq.; 42 U.S.C. § 5101 (providing emergency response, family reunification and other benefits and services to children or needy

able under these federally-funded programs regardless of immigration status.

The Women, Infants and Children program is a federally-funded program administered by California through the Department of Health Services. Welf. & Inst. Code § 15500 *et seq.* The federal statutes governing the program do not condition eligibility on lawful immigration status. *See* 42 U.S.C. § 1786. Defendants concede, as they must, that if the Women, Infants and Children program is a "public social service" within the meaning of section 5, conditioning eligibility for benefits under the program on lawful immigration status conflicts with the federal law which makes those benefits available regardless of immigration status. Given California's broad definition of "public social service," section 5's denial of public social services clearly applies to the Women, Infants and Children program. Therefore, section 5's denial of social services as applied to the program conflicts with federal law.

Qualified child welfare services programs administered by states receive grants of federal funding under various federal laws.[27] Defendants do not dispute that section 5 conflicts with these laws if construed to apply to federally-funded child welfare programs for which federal law does not condition eligibility on immigration status. Rather, defendants argue that child welfare services are entirely outside the scope of section 5 as a matter of statutory construction. Defendants contend that subsection 5(c)(1) applies only to public social service programs to which persons voluntarily and affirmatively *apply.* They argue that because child welfare services are generally extended to children who are involuntarily placed in the protective custody of the state and are not benefits for which a person voluntarily applies, section 5 is inapplicable to child welfare services. This distinction is specious. Section 5 applies broadly to deny "public social services" and "benefits and services" to persons present in the United States in violation of

federal law. § 5(c)(1). Child welfare services fall squarely within California's definition of public social services. *See* Cal.Welf. & Inst.Code § 16500. Moreover, some children do affirmatively seek state intervention (either personally or through a representative). Thus, defendants' construction of section 5 would deny benefits to children who actively seek placement with child welfare services, while granting the same services to children who wait for the state to intervene. Because this absurd result could not have been contemplated by the voters and because child welfare services fall squarely within California's definition of public social services, child welfare services are not excluded from section 5's coverage.

The question remains, however, whether the application of section 5 to child welfare services conflicts with federal law. Plaintiffs identify several federal provisions allocating money to and governing child welfare services[28] that are available to children regardless of immigration status. Section 5 conditions receipt of child welfare services on lawful immigration status. Therefore, section 5, as applied to child welfare services, conflicts with federal law.

Finally, section 5 may serve to deny state-administered public social services that are not part of any federal-state cooperative program and do not receive any federal funding. As noted above, the Court is unable to conclude that such wholly state-funded programs in fact exist.[29] If such programs do exist, it does not appear that section 5's denial of wholly state-funded benefits would conflict with and be preempted by federal law. That the state's denial of such benefits may be unconstitutional on other grounds is not a question before the Court at this time.

In sum, section 5's benefits denial provisions conflict with federal law as applied to public social services funded in any part by the federal government and made available to persons under the authorizing federal statutes regardless of immigration status. Sec-

---

families with children regardless of immigration status).

27. *See supra* n. 26.

28. *See supra* n. 26.

29. Defendants assert generally that such programs exist. However, they have not specifically identified any such program.

tion 5, to the extent that it denies benefits under wholly state-funded programs and under federal-state cooperative programs such as Medicaid, Food Stamps and AFDC, eligibility for which Congress has already conditioned on lawful immigration status, does not appear to conflict with federal law. The Court makes no determination, however, as to whether section 5's benefits. denial provision is wholly preempted. A further showing would be required to reach this conclusion.

### (2) Section 6

The remaining benefits denial provision of section 6 requires "any publicly funded health care facility" in California to deny services "other than emergency medical care as required by federal law" to persons determined to be "alien[s] in the United States in violation of federal law." §§ 6(c), 6(c)(1).

Plaintiffs contend that subsection (c)(1) of section 6, as applied to health care facilities which receive any federal funding, conflicts with and is preempted by federal laws, specifically the Hill–Burton Act,[30] the Public Health Service Act ("PHSA"),[31] and the Emergency Medical Treatment and Active Labor Act ("EMTALA"),[32] which require the provision of emergency and other health care services regardless of immigration status.

Defendants respond that because the goal of section 6 is to prevent the use of *public* funds to provide health care services to persons not lawfully in the country, Hill–Burton and PHSA facilities are not prevented from providing *all* services to unlawful immigrants but, rather, are merely denied *public reimbursement* for the services so provided. Further, defendants contend that emergency medical care required by EMTALA is explicitly excluded from the scope of section 6.

### (a) The Hill–Burton Act

The Hill–Burton Act, 42 U.S.C. § 291 *et seq.*, provides for allocation of federal funds to states for the rehabilitation, construction or modernization of public and non-profit hospitals. *See* 42 U.S.C. § 291c. In an application for funds under the Act, the applicant state and institution must make assurances that:

. (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor. . . .

42 U.S.C. § 291c(e). The regulations promulgated pursuant to the Act interpret the assurance that the facilities will be made available to "all persons" to mean that services be provided

to all persons residing . . . in the facility's service area, without discrimination on the ground of race, color, national origin, creed or *any other ground unrelated to an individual's need for the service or the availability of the needed service in the facility.*

42 C.F.R. § 124.603(a)(1) (emphasis added). Plaintiffs argue that section 6 conflicts with federal law because it requires Hill–Burton facilities to deny health services based on immigration status, a ground unrelated to the individual's need or the availability of needed services. Plaintiffs contend that section 6 must be read to prohibit the provision of *all* health services to undocumented persons, even services to be self-paid by the patient or funded by private charity, and therefore cannot be construed to avoid conflict with the Hill–Burton Act.

Defendants argue that Hill–Burton facilities are not prohibited from providing *all* services to undocumented persons but, rather, are merely prohibited from providing *publicly-funded* services to such persons. In other words, relying on language in the

---

**30.** 42 U.S.C. § 291c(e); 42 C.F.R. § 124.603(a)(1) (requiring Hill–Burton funding recipient facilities to make services "available to all persons residing in the territorial area" of the facilities regardless of immigration status).

**31.** 42 U.S.C. § 254c; 42 C.F.R. § 51c.303(v) (federal grant recipient public and nonprofit private "community health centers" serving "medi-cally underserved populations" to provide health care regardless of immigration status).

**32.** 42 U.S.C. § 1395dd (requiring hospitals that receive Medicare reimbursements to screen and stabilize emergency patient regardless of patient's immigration status).

preamble of section 6 evidencing an intent to deny "publicly-funded health care" to persons present in violation of federal immigration laws, defendants argue that Hill–Burton facilities may provide self-paid or charitable services to undocumented persons, and therefore no conflict with federal law exists. *See* § 6(a).

The plain language of subsection 6(c)(1) broadly prohibits "any publicly-funded health care facility"[33] from providing "health care services" or "services" other than emergency services required by federal law. § 6(c)(1). Despite the language in subsection 6(a) evidencing an intent to deny undocumented persons "the benefits of *publicly-funded* health care" and to "protect *public funds* from misuse," subsection (c) contains no such limiting language, and proscribes the provision of "services," generally, by publicly-funded health care facilities to persons unlawfully present in the United States. §§ 6(a), (c). Further, health care facilities do not, as a practical matter, at the service provider level, make distinctions between services that are "publicly-funded" and services that are funded by other sources. It is difficult for the Court to conceive of a manner in which section 6 could operate under the construction urged by the defendants. The Court thus declines to eschew the plain language of the statute in favor of defendant's interpretation. Section 6 must be construed to require publicly-funded health care facilities to deny all services other than emergency medical care required by federal law. Because Hill–Burton facilities must make their services available to all persons without regard to immigration status, the operation of section 6

conflicts with the requirements of the Hill–Burton Act.

Even if section 6's denial of health care services is construed to apply only to publicly-funded services, denying "free" services based on immigration status nevertheless conflicts with the Hill–Burton Act's requirement that each recipient facility provide a "reasonable volume of services to persons unable to pay therefor," 42 U.S.C. §. 291c(e)(2), without discrimination based on any ground "unrelated to an individual's need for the service or the availability of the needed service in the facility ..." 42 C.F.R. § 124.603(a)(1). This does not mean that a Hill–Burton facility is required to treat any person, regardless of his or her ability to pay, who appears at the doors simply because the person resides in the facility's area. Rather, Hill–Burton facilities are required to provide a "reasonable volume of services" to persons unable to pay without discriminating between these persons on any basis unrelated to patient need or service availability. That is, Hill–Burton facilities may not close the door on a person based merely on immigration status. Section 6's denial of health care services, to the extent it applies to Hill–Burton facilities, conflicts with federal law.

### (b) Public Health Service Act

Under the Public Health Service Act, 42 U.S.C. § 201 *et seq.*, grants of federal funds are available to public and nonprofit private entities for projects to plan and develop "community health centers" to serve medically underserved populations. 42 U.S.C. § 254c(c). The Public Health Service Act defines "community health center" as an entity which, "through its staff ... or

---

**33.** Subsection (d) of section 6 provides that the term "publicly-funded health care facility" is to be defined as specified in Sections 1200 and 1250 of the California Health and Safety Code. Section 1250 defines "health facility" as:

> any facility, place or building which is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, to which the persons are admitted for a 24–hour stay or longer ...

Cal. Health & Safety Code § 1250. Section 1200 defines "clinic" as follows:

> an organized outpatient health facility which provides direct medical, surgical, dental, optometric, or podiatric advice, services or treatment to patients who remain less than 24 hours, and which may also provide diagnostic or therapeutic services to patients in the home as an incident to care provided at the clinic facility.

Cal. Health & Safety Code § 1200. While these sections define "health care facility," they fail to explain what is intended by the term "publicly-funded." Under these broad definitions, section 6 must be construed to apply to all hospitals that receive any "public" funding, state or federal.

through ... cooperative arrangements with other public or private entities" provides health and health-related information and referral services to residents of the area it serves (the "catchment area"). 42 U.S.C. § 254c(a). The Act provides for grants of federal funds to community health centers serving areas designated as having a shortage of personal health services. 42 U.S.C. § 254c(c); 254c(b)(3). Any hospital or other facility receiving grants under this section for the purpose of serving a medically underserved population is a "community health facility" within the meaning of the Public Health Services Act. Community health centers funded under section 254c(c) must be administered to ensure that services are made available and accessible in a manner "assur[ing] continuity of service to the residents of the center's catchment area." 42 C.F.R. § 51c.303(a).

Plaintiffs argue that section 6, which prohibits community health centers from providing *any* services to catchment area residents in the United States unlawfully, conflicts with and is preempted by the Act which requires such facilities to make services available to *catchment area residents* regardless of those persons' immigration status. Defendants respond that facilities deemed "community health centers" by virtue of their receipt of federal funding under the Act are only prohibited from providing *publicly-funded* health services and may provide *self-paid* or *privately-funded* services to undocumented persons. However, because section 6 requires all "publicly-funded health care facilities" to deny "health care services" and "services" other than emergency medical services, and does not by its language limit such denial to services for which reimbursements with public money are made, section 6 conflicts with the Public Health Service Act provisions pertaining to federally-funded community health centers.

### (c) Emergency Medical Treatment and Active Labor Act

EMTALA, 42 U.S.C. § 1395dd, requires hospitals under Medicare provider agreements with the federal government to provide "an appropriate medical screening examination" to "any individual" requesting medical treatment from hospital emergency departments regardless of the person's ability to pay. 42 U.S.C. § 1395dd(a). The screening must include all routinely available ancillary services, and, if the patient is found to have an "emergency condition," the hospital is required to provide the care necessary to stabilize the patient's condition. 42 U.S.C. § 1395dd(b). The hospital may not delay in providing a screening or treatment required to stabilize an emergency condition in order to inquire about an individual's insurance or ability to pay for services. 42 U.S.C. § 1395dd(h).

 Plaintiffs contend that section 6 conflicts with EMTALA because it precludes health care facilities from providing the required screening to persons whose conditions do not appear to require "emergency medical care," the only services exempted from section 6. §§ 6(a), 6(c).[34] Defendants argue that subsections (a) and (c), by creating an exception for "emergency medical care as required by federal law," exempt all of EMTALA's screening, stabilization and treatment requirements and therefore do not conflict with federal law. *Id.* Because the clear intent of the enacting body was to exempt "emergency medical care *as required by federal law*," and it is reasonable to interpret this exemption to include all of EMTALA's screening, stabilization and treatment requirements, the Court concludes that section 6's denial of health services does not conflict with but, rather, is entirely consistent with, federal law pertaining to emergency medical services.

In sum, section 6 must be construed to require all publicly-funded health care facilities to deny *all* medical services, except emergency screening and treatment procedures required by federal law, to persons not lawfully present in the United States under federal law. To the extent that section 6

---

**34.** Plaintiffs also argue that subsection (b) of section 6 conflicts with EMTALA by delaying the provision of care until the patient's immigration status is determined. Since subsection (b) is preempted under both the first and third *De Canas* tests, this argument merits no further discussion here.

applies to facilities that receive federal funding under programs such as the Hill–Burton and Public Health Services Act and requires denial of non-emergency medical services to persons unlawfully present where the federal legislation enabling the programs is silent with respect to the immigration status of medical care recipients, section 6 conflicts with federal law. However, to the extent that section 6 applies to wholly *state-funded* health care facilities, if in fact such facilities exist[35], the denial of non-emergency health services to persons unlawfully present in the United States does not appear to conflict with any federal law. While recognizing these conflicts, the Court cannot determine on the record before it whether section 6's denial of benefits provision is entirely preempted or preempted only to the extent that it applies to federal grant recipient health care facilities.

### (3) Section 7

Section 7 denies public elementary and secondary education to (i) children who are in the United States in violation of federal law, and (ii) children who are citizens or otherwise legally present, but whose parents or guardians are in the United States unlawfully. *See* §§ 7(a), 7(e), 7(f). This denial of public education directly conflicts with federal law as announced in the Supreme Court's decision in *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).[36] In *Plyler,* the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying "to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens." *Plyler,* 457 U.S. at 205, 102 S.Ct. at 2388. The Supreme Court rejected each of the state's proffered justifications for denying education to undocumented children, including the desire "to protect itself from an influx of illegal immigrants," to "preserv[e] . . . the state's limited resources for the education of its lawful residents," and to remove the alleged "special burdens [undocumented children] impose on the State's ability to provide high-quality public education," as constitutionally insufficient to deny children access to a basic education and noted the conflict that would result if the state were to deny education to "a child enjoying an inchoate federal permission to remain." *Id.* at 226–230, 102 S.Ct. at 2399–2401. Clearly, then, section 7's denial of a public education based on the immigration status of the child or the child's parent or guardian conflicts with and is preempted by federal law as announced by the Supreme Court in *Plyler.*[37]

---

**35.** Defendants have not identified any wholly state-funded health care facilities.

**36.** Although plaintiffs did not assert *Plyler* as a basis for conflict preemption of section 7 in their motions for summary judgment, the Court is nevertheless constrained to consider the irreconcilable conflict between section 7 and federal law as announced by the Supreme Court in that case. The Ayala plaintiffs have also alleged that section 7 directly conflicts with the Individuals With Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (the "IDEA"), because the IDEA specifically guarantees a free appropriate public education to all disabled children, regardless of immigration status. Since the Court finds here that section 7 is preempted in its entirety as applied to *all* children, this separate ground for summary judgment need not be considered.

**37.** In finding the state's reasons for attempting to withhold public education from undocumented children constitutionally "insubstantial," the Supreme Court in *Plyler* was particularly concerned with the state statute because it was directed at children, persons the Court deemed "special members" of the "underclass" of undocumented aliens present in this country. *Plyler,* 457 U.S. at 219, 102 S.Ct. at 2396. Distinguishing undocumented children, who are capable of affecting " 'neither their parents' conduct nor their own status,' " from their adult parents, who are willingly present in violation of federal immigration laws, the Court concluded that it is "difficult to conceive of a rational justification for penalizing these children for their presence within the United States." *Id.* at 219–220, 102 S.Ct. at 2396 (citing *Trimble v. Gordon,* 430 U.S. 762, 770, 97 S.Ct. 1459, 1465, 52 L.Ed.2d 31 (1977)). While "[p]ersuasive arguments support the view that a State may withhold its beneficence from those whose very presence within the United States is the product of their own unlawful conduct," the "arguments do not apply with the same force to classifications imposing disabilities on the minor *children* of such illegal entrants." *Id.* Recognizing the costs the state statute imposed on "the innocent children who [were] its victims, the Court concluded that the statute failed equal protection scrutiny, despite the fact that classifications based on undocumented alien status are not suspect and education is not a fundamental

The remaining provisions of section 7, subsections (b), (c), (d) and (e), require school districts to verify the immigration status of prospective and current students and their parents or guardians, to notify students and parents or guardians of their suspected unlawful status and to report such information to state and federal officials. These provisions, aimed at regulating immigration or effecting a denial of public education that is prohibited by federal law, have no permissible purpose. Section 7 is preempted in its entirety.[38]

### (4) Section 8

Section 8 prohibits public postsecondary educational institutions from admitting, enrolling or permitting the attendance of persons who are not "authorized under federal law to be present in the United States." § 8(a).

Plaintiffs do not identify any provision of federal law that conflicts with section 8's denial of education. On its face, subsection (a) is consistent with the INS statement permitting aliens "considered to be residing permanently in the United States under color of law" to study in the country. Section 8's denial of education to persons who are not "authorized under federal law to be present in the United States," does not appear to conflict with any federal law. Subsection (a) of section 8 is not preempted under the third De Canas test.

### 3. Criminal Penalty Provisions

Sections 2 and 3 of Proposition 187 make it a crime to manufacture, distribute, sell or use false documents to conceal true citizenship or immigration status. Violations of these statutes are punishable by imprisonment for up to five years or, in the case of manufacturing, distributing or selling false documents, a fine of up to $75,000 and for use of such documents, a fine of up to $25,000. §§ 2, 3. Plaintiffs argue that by imposing different penalties than those already imposed under federal laws regulating the production or use of false citizenship, naturalization and alien registration papers and the misuse or forgery of passports and visas,[39] sections 2 and 3 conflict with federal law. There has been no showing that the criminal penalties contemplated by sections 2 and 3 conflict with or impede the objectives of federal law. Sections 2 and 3 are not preempted under the third De Canas test.

### IV. Conclusion

The California voters' overwhelming approval of Proposition 187 reflects their justifiable frustration with the federal government's inability to enforce the immigration laws effectively. No matter how serious the problem may be, however, the authority to regulate immigration belongs exclusively to the federal government and state agencies are not permitted to assume that authority. The State is powerless to enact its own scheme to regulate immigration or to devise immigration regulations which run parallel to or purport to supplement the federal immigration laws.

The classification, notification and cooperation/reporting provisions in sections 4 through 9 of the initiative, taken together,

right, because it failed to further "some substantial goal of the State." Id. at 244, 102 S.Ct. at 2398. The Supreme Court's reasoning and ruling in Plyler appears to compel a finding that section 6's denial of health care services, as applied to undocumented children, is equally without "rational justification" and offensive to the principles of equal protection. Id. at 220, 102 S.Ct. at 2396. Although the Court declines at this time to rule on this extension of Plyler, it does note that section 6, to the extent it denies health care services to undocumented children, appears to be in direct conflict with federal law.

**38.** Because severing section 7 in its entirety does not impede the functioning of the remainder of the initiative, does not render the remainder un-

intelligible, and cannot be said to be so crucial to the passage of the initiative that the initiative would have failed in its absence, section 7 is functionally, grammatically, and volitionally severable from the remaining sections.

**39.** See 8 U.S.C. § 1306(d) (false alien registration cards); 18 U.S.C. §§ 1424, 1425 (false papers in naturalization proceedings); 18 U.S.C. § 1028 (production, possession or use of false identification documents); 18 U.S.C. § 1426 (false naturalization, citizenship or alien registration papers); 18 U.S.C. §§ 1542–1543 (forgery or false use of passport); 18 U.S.C. § 1544 (misuse of passport); 18 U.S.C. § 1546 (fraud and misuse of visas); 18 U.S.C. § 911 (false claim to citizenship).

constitute a regulatory scheme (1) to detect persons present in California in violation of state-created categories of lawful immigration status; (2) to notify state and federal officials of their purportedly unlawful status; and (3) to effect their removal from the United States. These provisions create an impermissible state scheme to regulate immigration and are preempted under the first and second *De Canas* tests. Plaintiffs' motions for summary judgment are granted with respect to these provisions.

The benefits denial provisions of the initiative—if implemented by state regulations which would require verification of immigration status by reference to federal determinations of status—have only an incidental impact on immigration and thus do not violate the first *De Canas* test. Nor do those provisions violate the second *De Canas* test. Plaintiffs have failed to direct the Court to any authority for the proposition that Congress intended to completely oust state authority to legislate in the area of benefits denial. Consequently, the Court must conclude that those provisions are preempted only if their operation conflicts with or impedes the objectives of federal laws.

Section 7's denial of primary and secondary education conflicts with federal law as announced by the Supreme Court in *Plyler v. Doe* and is therefore preempted. Section 8's denial of postsecondary education does not appear to conflict with any federal law and thus is not preempted. With respect to the benefits denial provisions in sections 5 and 6, to the extent that they deny *federally-funded* benefits and services, those provisions conflict with federal laws authorizing such benefits and services without reference to immigration status. It is unclear from the showing made whether the existence of such conflicts render sections 5 and 6 wholly preempted or preempted only to the extent that they conflict with federal law. Moreover, the Court may not need to reach that issue, for while it appears that the state could permissibly deny wholly *state-funded* benefits and services without impeding the objectives of federal law, it is unclear from the record whether any such purely state-funded programs or health care facilities in

fact exist. The showing made on these motions is inadequate to permit the Court to resolve the issue of whether the provisions are wholly preempted or whether they are preempted only to a limited extent. For these reasons, plaintiffs' motions with respect to the denial of benefits provisions in sections 5 and 6 are denied.

Finally, for the reasons set forth above, sections 2 and 3 are not preempted. Plaintiffs motions with respect to those sections are denied.

The preliminary injunction entered by the Court on December 14, 1994, shall remain in effect until further order of the Court.

## APPENDIX A

### PROPOSITION 187

### TEXT

SECTION 1. Findings and Declaration.

The People of California find and declare as follows:

That they have suffered and are suffering economic hardship caused by the presence of illegal aliens in this state.

That they have suffered and are suffering personal injury and damage by the criminal conduct of illegal aliens in this state.

That they have a right to the protection of their government from any person or persons entering this country unlawfully.

Therefore, the People of California declare their intention to provide for cooperation between their agencies of state and local government with the federal government, and to establish a system of required notification by and between such agencies to prevent illegal aliens in the United States from receiving benefits or public services in the State of California.

SECTION 2. Manufacture, Distribution or Sale of False Citizenship or Resident Alien Documents: Crime and Punishment.

Section 113. is added to the Penal Code, to read:

Section 113. Any person who manufactures, distributes or sells false documents to conceal the true citizenship or resident alien

status of another person is guilty of a felony, and shall be punished by imprisonment in the state prison for five years or by a fine of seventy-five thousand dollars ($75,000).

SECTION 3. Use of False Citizenship or Resident Alien Documents: Crime and Punishment.

Section 114. is added to the Penal Code, to read:

Section 114. Any person who uses false documents to conceal his or her true citizenship or resident alien status is guilty of a felony, and shall be punished by imprisonment in the state prison for five years or by a fine of twenty-five thousand dollars ($25,000).

SECTION 4. Law Enforcement Cooperation with INS.

Section 834b is added to the Penal Code, to read:

Section 834b. (a) Every law enforcement agency in California shall fully cooperate with the United States Immigration and Naturalization Service regarding any person who is arrested if he or she is suspected of being present in the United States in violation of federal immigration laws.

(b) With respect to any such person who is arrested, and suspected of being present in the United States in violation of federal immigration laws, every law enforcement agency shall do the following:

(1). Attempt to verify the legal status of such person as a citizen of the United States, an alien lawfully admitted as a permanent resident, an alien lawfully admitted for a temporary period of time or as an alien who is present in the United States in violation of immigration laws. The verification process may include, but shall not be limited to, questioning the person regarding his or her date and place of birth and entry into the United States, and demanding documentation to indicate his or her legal status.

(2). Notify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that, apart from any criminal justice precedings [sic], he

or she must either obtain legal status or leave the United States.

(3). Notify the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status and provide any additional information that may be requested by any other public entity.

(c) Any legislative, administrative, or other action by a city, county, or other legally authorized local governmental entity with jurisdictional boundaries, or by a law enforcement agency, to prevent or limit the cooperation required by subdivision (a) is expressly prohibited.

SECTION 5. Exclusion of Illegal Aliens from Public Social Services.

Section 10001.5. is added to the Welfare and Institutions Code, to read:

Section 10001.5. (a) In order to carry out the intention of the People of California that only citizens of the United States and aliens lawfully admitted to the United States may receive the benefits of public social services and to ensure that all persons employed in the providing of those services shall diligently protect public funds from misuse, the provisions of this section are adopted.

(b) A person shall not receive any public social services to which he or she may be otherwise entitled until the legal status of that person has been verified as one of the following:

(1). A citizen of the United States.

(2). An alien lawfully admitted as a permanent resident.

(3). An alien lawfully admitted for a temporary period of time.

(c) If any public entity in this state to whom a person has applied for public social services determines or reasonably suspects, based upon the information provided to it, that the person is an alien in the United States in violation of federal law, the following procedures shall be followed by the public entity:

(1). The entity shall not provide the person with benefits or services.

(2). The entity shall, in writing, notify the person of his or her apparent illegal immigration status, and that the person must either obtain legal status or leave the United States.

(3). The entity shall also notify the State Director of Social Services, the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status, and shall provide any additional information that may be requested by any other public entity.

SECTION 6. Exclusion of Illegal Aliens from Publicly Funded Health Care.

Chapter 1.3 (commencing with Section 130) is added to Part 1 of Division 1 of the Health and Safety Code, to read:

CHAPTER 1.3. PUBLICLY–FUNDED HEALTH CARE SERVICES

Section 130. (a) In order to carry out the intention of the People of California that, excepting emergency medical care as required by federal law, only citizens of the United States and aliens lawfully admitted to the United States may receive the benefits of publicly-funded health care, and to ensure that all persons employed in the providing of those services shall diligently protect public funds from misuse, the provisions of this section are adopted.

(b) A person shall not receive any health care services from a publicly-funded health care facility, to which he or she is otherwise entitled until the legal status of that person has been verified as one of the following:

(1). A citizen of the United States.

(2). An alien lawfully admitted as a permanent resident.

(3). An alien lawfully admitted for a temporary period of time.

(c) If any publicly-funded health care facility in this state from whom a person seeks health care services, other than emergency medical care as required by federal law, determines or reasonably suspects, based upon the information provided to it, that the person is an alien in the United States in violation of federal law, the following procedures shall be followed by the facility:

(1). The facility shall not provide the person with services.

(2). The facility shall, in writing, notify the person of his or her apparent illegal immigration status, and that the person must either obtain legal status or leave the United States.

(3). The facility shall also notify the State Director of Social Services, the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status, and shall provide any additional information that may be requested by any other public entity.

(d) For purposes of this section "publicly-funded health care facility" shall be defined as specified in Section 1200 and 1250 of the Health and Safety Code as of January 1, 1993.

SECTION 7. Exclusion of Illegal Aliens From Public Elementary and Secondary Schools.

Section 48215. is added to the Education Code to read:

Section 48215. (a) No public elementary or secondary school shall admit, or permit the attendance of, any child who is not a citizen of the United States, an alien lawfully admitted as a permanent resident, or a person who is otherwise authorized under federal law to be present in the United States.

(b) Commencing January 1, 1995, each school district shall verify the legal status of each child enrolling in the school district for the first time in order to ensure the enrollment or attendance only of citizens, aliens lawfully admitted as permanent residents, or persons who are otherwise authorized to be present in the United States.

(c) By January 1, 1996, each school district shall have verified the legal status of each child already enrolled and in attendance in the school district in order to ensure the enrollment or attendance only of citizens, aliens lawfully admitted as permanent residents, or persons who are otherwise authorized under federal law to be present in the United States.

(d) By January 1, 1996, each school district shall also have verified the legal status of each parent or guardian of each child referred to in subdivision (b) and (c) above, to determine whether such parent or guardian is one of the following:

(1). A citizen of the United States.

(2). An alien lawfully admitted as a permanent resident.

(3). An alien admitted lawfully for a temporary period of time.

(e) Each school district shall provide information to the State Superintendent of Public Instruction, the Attorney General of California and the United States Immigration and Naturalization Service regarding any enrollee or pupil, or parent or guardian, attending a public elementary or secondary school in the school district determined or reasonably suspected to be in violation of federal immigration laws within forty five days after becoming aware of an apparent violation. The notice shall also be provided to the parent or legal guardian of the enrollee or pupil, and shall state that an existing pupil may not continue to attend the school after ninety calendar days from the date of the notice, unless legal status is established.

(f) For each child who cannot establish legal status in the United States, each school district shall continue to provide education for a period of ninety days from the date of the notice. Such ninety day period shall be utilized to accomplish an orderly transition to a school in the child's country of origin. Each school district shall fully cooperate in this transition effort to ensure that the educational needs of the child are best served for that period of time.

SECTION 8. Exclusion of Illegal Aliens from Public Postsecondary Educational Institutions.

Section 66010.8. is added to the Education Code, to read:

Section 66010.8. (a) No public institution of postsecondary education shall admit, enroll, or permit the attendance of any person who is not a citizen of the United States, an alien lawfully admitted as a permanent resident, in the United States, or a person who is otherwise authorized under federal law to be present in the United States.

(b) Commencing with the first term or semester that begins after January 1, 1995, and at the commencement of each term or semester thereafter, each public postsecondary educational institution shall verify the status of each person enrolled or in attendance at that institution in order to ensure the enrollment or attendance only of United States citizens, aliens lawfully admitted as permanent residents in the United States, and persons who are otherwise authorized under federal law to be present in the United States.

(c) No later than 45 days after the admissions officer of a public postsecondary educational institution becomes aware of the application, enrollment, or attendance of a person determined to be, or who is under reasonable suspicion of being, in the United States in violation of federal immigration laws, that officer shall provide that information to the State Superintendent of Public Instruction, the Attorney General of California and the United States Immigration and Naturalization Service. The information shall also be provided to the applicant, enrollee, or person admitted.

SECTION 9. Attorney General cooperation with the INS.

Section 53069.65. is added to the Government Code, to read:

53069.65. Whenever the state or a city, or a county, or any other legally authorized local governmental entity with jurisdictional boundaries reports the presence of a person who is suspected of being present in the United States in violation of federal immigration laws to the Attorney General of California, that report shall be transmitted to the United States Immigration and Naturalization Service. The Attorney General shall be responsible for maintaining on-going and accurate records of such reports, and shall provide any additional information that may be requested by any other government entity.

SECTION 10. Amendment and Severability.

The statutory provisions contained in this measure may not be amended by the Legislature except to further its purposes by statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the voters.

In the event that any portion of this act or the application thereof to any person or circumstance is held invalid, that invalidity shall not affect any other provision or application of the act, which can be given effect without the invalid provision or application, and to that end the provisions of this act are severable.

## *APPENDIX B*
### PROPOSITION 187
### TEXT

SECTION 1. Findings and Declaration.

The People of California find and declare as follows:

That they have suffered and are suffering economic hardship caused by the presence of illegal aliens in this state.

That they have suffered and are suffering personal injury and damage by the criminal conduct of illegal aliens in this state.

That they have a right to the protection of their government from any person or persons entering this country unlawfully.

Therefore, the People of California declare their intention to provide for cooperation between their agencies of state and local government with the federal government, and to establish a system of required notification by and between such agencies to prevent illegal aliens in the United States from receiving benefits or public services in the State of California.

SECTION 2. Manufacture, Distribution or Sale of False Citizenship or Resident Alien Documents: Crime and Punishment.

Section 113. is added to the Penal Code, to read:

Section 113. Any person who manufactures, distributes or sells false documents to conceal the true citizenship or resident alien status of another person is guilty of a felony, and shall be punished by imprisonment in the state prison for five years or by a fine of seventy-five thousand dollars ($75,000).

SECTION 3. Use of False Citizenship or Resident Alien Documents: Crime and Punishment.

Section 114. is added to the Penal Code, to read:

Section 114. Any person who uses false documents to conceal his or her true citizenship or resident alien status is guilty of a felony, and shall be punished by imprisonment in the state prison for five years or by a fine of twenty-five thousand dollars ($25,000).

SECTION 4. Law Enforcement Cooperation with INS.

Section 834b is added to the Penal Code, to read:

Section 834b. (a) Every law enforcement agency in California shall fully cooperate with the United States Immigration and Naturalization Service regarding any person who is arrested if he or she is suspected of being present in the United States in violation of federal immigration laws.

(b) With respect to any such person who is arrested, and suspected of being present in the United States in violation of federal immigration laws, every law enforcement agency shall do the following:

(1). Attempt to verify the legal status of such person as a citizen of the United States, an alien lawfully admitted as a permanent resident, an alien lawfully admitted for a temporary period of time or as an alien who is present in the United States in violation of immigration laws. The verification process may include, but shall not be limited to, questioning the person regarding his or her date and place of birth and entry into the United States, and demanding documentation to indicate his or her legal status.

(2). Notify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that, apart from any criminal justice preceedings [sic], he

or she must either obtain legal status or leave the United States.

(3). Notify the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status and provide any additional information that may be requested by any other public entity.

(c) Any legislative, administrative, or other action by a city, county, or other legally authorized local governmental entity with jurisdictional boundaries, or by a law enforcement agency, to prevent or limit the cooperation required by subdivision (a) is expressly prohibited.

SECTION 5. Exclusion of Illegal Aliens from Public Social Services.

Section 10001.5. is added to the Welfare and Institutions Code, to read:

Section 10001.5. (a) In order to carry out the intention of the People of California that only citizens of the United States and aliens lawfully admitted to the United States may receive the benefits of public social services and to ensure that all persons employed in the providing of those services shall diligently protect public funds from misuse, the provisions of this section are adopted.

(b) A person shall not receive any public social services to which he or she may be otherwise entitled until the legal status of that person has been verified as one of the following:

(1). A citizen of the United States.

(2). An alien lawfully admitted as a permanent resident.

(3). An alien lawfully admitted for a temporary period of time.

(c) If any public entity in this state to whom a person has applied for public social services determines or reasonably suspects, based upon the information provided to it, that the person is an alien in the United States in violation of federal law, the following procedures shall be followed by the public entity:

(1). The entity shall not provide the person with benefits or services.

(2). The entity shall, in writing, notify the person of his or her apparent illegal immigration status, and that the person must either obtain legal status or leave the United States.

(3). The entity shall also notify the State Director of Social Services, the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status, and shall provide any additional information that may be requested by any other public entity.

SECTION 6. Exclusion of Illegal Aliens from Publicly Funded Health Care.

Chapter 1.3 (commencing with Section 130) is added to Part 1 of Division 1 of the Health and Safety Code, to read:

CHAPTER 1.3. PUBLICLY–FUNDED HEALTH CARE SERVICES

Section 130. (a) In order to carry out the intention of the People of California that, excepting emergency medical care as required by federal law, only citizens of the United States and aliens lawfully admitted to the United States may receive the benefits of publicly-funded health care, and to ensure that all persons employed in the providing of those services shall diligently protect public funds from misuse, the provisions of this section are adopted.

(b) A person shall not receive any health care services from a publicly-funded health care facility, to which he or she is otherwise entitled until the legal status of that person has been verified as one of the following:

(1). A citizen of the United States.

(2). An alien lawfully admitted as a permanent resident.

(3). An alien lawfully admitted for a temporary period of time.

(c) If any publicly-funded health care facility in this state from whom a person seeks health care services, other than emergency medical care as required by federal law, determines or reasonably suspects, based upon the information provided to it, that the person is an alien in the United States in violation of federal law, the following procedures shall be followed by the facility:

(1). The facility shall not provide the person with services.

(2). The facility shall, in writing, notify the person of his or her apparent illegal immigration status, and that the person must either obtain legal status or leave the United States.

(3). The facility shall also notify the State Director of Social Services, the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status, and shall provide any additional information that may be requested by any other public entity.

(d) For purposes of this section "publicly-funded health care facility" shall be defined as specified in Section 1200 and 1250 of the Health and Safety Code as of January 1, 1993.

SECTION 7. Exclusion of Illegal Aliens From Public Elementary and Secondary Schools.

Section 48215. is added to the Education Code to read:

Section 48215. (a) No public elementary or secondary school shall admit, or permit the attendance of, any child who is not a citizen of the United States, an alien lawfully admitted as a permanent resident, or a person who is otherwise authorized under federal law to be present in the United States.

(b) Commencing January 1, 1995, each school district shall verify the legal status of each child enrolling in the school district for the first time in order to ensure the enrollment or attendance only of citizens, aliens lawfully admitted as permanent residents, or persons who are otherwise authorized to be present in the United States.

(c) By January 1, 1996, each school district shall have verified the legal status of each child already enrolled and in attendance in the school district in order to ensure the enrollment or attendance only of citizens, aliens lawfully admitted as permanent residents, or persons who are otherwise authorized under federal law to be present in the United States.

(d) By January 1, 1996, each school district shall also have verified the legal status of each parent or guardian of each child referred to in subdivision (b) and (c) above, to determine whether such parent or guardian is one of the following:

(1). A citizen of the United States.

(2). An alien lawfully admitted as a permanent resident.

(3). An alien admitted lawfully for a temporary period of time.

(e) Each school district shall provide information to the State Superintendent of Public Instruction, the Attorney General of California and the United States Immigration and Naturalization Service regarding any enrollee or pupil, or parent or guardian, attending a public elementary or secondary school in the school district determined or reasonably suspected to be in violation of federal immigration laws within forty-five days after becoming aware of an apparent violation. The notice shall also be provided to the parent or legal guardian of the enrollee or pupil, and shall state that an existing pupil may not continue to attend the school after ninety calendar days from the date of the notice, unless legal status is established.

(f) For each child who cannot establish legal status in the United States, each school district shall continue to provide education for a period of ninety days from the date of the notice. Such ninety day period shall be utilized to accomplish an orderly transition to a school in the child's country of origin. Each school district shall fully cooperate in this transition effort to ensure that the educational needs of the child are best served for that period of time.

SECTION 8. Exclusion of Illegal Aliens from Public Postsecondary Educational Institutions.

Section 66010.8. is added to the Education Code, to read:

Section 66010.8. (a) No public institution of postsecondary education shall admit, enroll, or permit the attendance of any person who is not a citizen of the United States, an alien lawfully admitted as a permanent resident, in the United States, or a person who is

794

otherwise authorized under federal law to be present in the United States.

(b) Commencing with the first term or semester that begins after January 1, 1995, and at the commencement of each term or semester thereafter, each public postsecondary educational institution shall verify the status of each person enrolled or in attendance at that institution in order to ensure the enrollment or attendance only of United States citizens, aliens lawfully admitted as permanent residents in the United States, and persons who are otherwise authorized under federal law to be present in the United States.

(c) No later than 45 days after the admissions officer of a public postsecondary educational institution becomes aware of the application, enrollment, or attendance of a person determined to be, or who is under reasonable suspicion of being, in the United States in violation of federal immigration laws, that officer shall provide that information to the State Superintendent of Public Instruction, the Attorney General of California and the United States Immigration and Naturalization Service. The information shall also be provided to the applicant, enrollee, or person admitted.

SECTION 9. Attorney General cooperation with the INS.

Section 53069.65. is added to the Government Code, to read:

53069.65. Whenever the state or a city, or a county, or any other legally authorized local governmental entity with jurisdictional boundaries reports the presence of a person who is suspected of being present in the United States in violation of federal immigration laws to the Attorney General of California, that report shall be transmitted to the United States Immigration and Naturalization Service. The Attorney General shall be responsible for maintaining on-going and accurate records of such reports, and shall provide any additional information that may be requested by any other government entity.

SECTION 10. Amendment and Severability.

The statutory provisions contained in this measure may not be amended by the Legislature except to further its purposes by statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the voters.

In the event that any portion of this act or the application thereof to any person or circumstance is held invalid, that invalidity shall not affect any other provision or application of the act, which can be given effect without the invalid provision or application, and to that end the provisions of this act are severable.